# Commonwealth *versus* Balph et al.

. The Supreme Court of this Commonwealth has power to issue a writ of *certiorari* to the Court of Quarter Sessions of any of the counties to remove a pending indictment and all proceedings thereon into the Supreme Court. It has the power of the Court of the King's Bench in criminal cases.

2. The Constitution of 1874 did not repeal the Act of 16th of June, 1836, nor the Act of 31st of March, 1860, conferring upon the Supreme Court the power to remove criminal cases into that court by *certiorari*.

3. The Supreme Court has power to send a criminal case, removed into that court by *certiorari*, down to another county for trial, and, if necessary, before any of the judges of the Supreme Court. Each judge of the Supreme Court has power to sit and try indictments in any county of the Commonwealth.

March 15th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

On the 1st of March, 1884, R. A. Balph, Henry P. Ford, N. S. Snyder and M. Harrison presented a petition to the Chief Justice of the Supreme Court, the court not being in session, praying that a writ of *certiorari* might issue to the Court of Quarter Sessions of Warren to remove the record and all proceedings in the case of the Commonwealth v. R. A.

[Commonwealth *v.* Balph.]

Balph, Henry P. Ford, N. S. Snyder and M. Harrison to the Supreme Court.

After consideration the court made the following orders :

Commonwealth *v.* R. A. Balph, Henry P. Ford, et al. Indictment pending in the Court of Quarter Sessions of the Peace in and for the County of Warren.

And now to wit: March 3d, 1884, on application of the defendants a rule is granted on the Commonwealth to show cause why a writ of *certiorari* shall not issue to the Court of Quarter Sessions of said county, to remove the record and all proceedings in due course to the court. Rule returnable on Saturday, the 15th of March instant. It is further ordered that all proceedings in the court below be stayed in the meantime. PER CURIAM.

GORDON and TRUNKEY, JJ., dissent to the granting of the rule.

The petition upon which the rule was granted set out *inter alia*, that the petitioners are all citizens of Allegheny County, Pa., that Balph is a member of the bar of said county, that Ford is one of the executors of Sarah Ann Ford, that Snyder and Harrison are of the detective force of Pittsburgh, and at the time of the grievances complained of were acting as Deputy Sheriffs of Allegheny County.

That S. V. Davis of Warren, Warren County, Pa., made information before a Justice of the Peace charging the defendants with conspiracy to seize, capture and arrest him and take him a prisoner, and in pursuance of said conspiracy did seize, capture and take him a prisoner, and that thereupon a warrant was issued for their arrest which was returned: The defendants not found in my bailiwick.

That the information and return were laid before the Grand Jury of Warren County, which found a true bill against them in accordance with the said information. That they were subsequently arrested at Pittsburgh and gave bail for their appearance at the next term of the Quarter Sessions of Warren County.

That the case is set down for trial March 3d, 1884.

That the circumstances which led to the making of the information and the finding of the true bill are in brief: That Sarah Ann Ford, since deceased, filed her bill in equity in the Court of Common Pleas, No. 1 of Allegheny County, alleging that she and her sister, Caroline M. Lacy, were tenants in common of certain timber tracts in the Counties of Forest and Clarion, Pa., that they had carried on a partnership in the development of said tracts and in the manufacture and sale of timber from said tracts. That irreconcilable differences existed

[Commonwealth v. Balph.]

between her and her sister as to the winding up of said business. She prayed, *inter alia*, for the appointment of a receiver. That upon due consideration on December 7th, 1881, the court appointed Samuel Lewis receiver, who qualified and took possession of said property and business for the purpose of administering the same under the direction of said court.

That Caroline M. Lacy and her husband filed a bill in equity in the Court of Common Pleas of Forest County, alleging the said tenancy in common of said lands and praying for the partition thereof. That the case was proceeded with until the 15th of March, 1882, when the court upon due consideration appointed S. V. Davis, Esq., of Warren, receiver, who qualified and undertook to take possession of the said property and business in possession of Samuel Lewis as receiver. That from that time forward continual disputes existed. That there was a conflict of authority between the two receivers each claiming the exclusive control and right of possession of the same business and property by virtue of orders of the respective courts appointing them.

That on the 5th day of June, 1882, the Court of Common Pleas, No. 1 of Allegheny County, granted a preliminary injunction restraining the said Caroline M. Lacy and her husband from interfering directly or indirectly with the authority of Samuel Lewis, receiver. From this decree an appeal was taken to the Supreme Court, which appeal was dismissed and the decree affirmed. That on application by the representatives of Sarah Ann Ford, the Court of Common Pleas of Forest County, on the 27th of February, 1883, made an order directing S. V. Davis, receiver, to withdraw from the control and custody of the said business and property.

That on application of the said S. V. Davis, the said Court of Common Pleas of Forest County, on the 22d of May, 1883, granted a writ of assistance directed to the Sheriff of Forest County to enter upon the said property and exclude all parties other than the said S. V. Lewis.

That on the 15th of June, 1883, the said Samuel Lewis, receiver, presented his petition to the Court of Common Pleas, No. 1, of Allegheny County, praying that an attachment might issue for contempt against S. V. Davis, who was interfering with him in the performance of his duty as receiver. That on the 22d of June, 1883, S. V. Davis filed his answer and after hearing on the 29th of June, 1883, an attachment was directed to issue by said court against the said S. V. Davis for contempt returnable forthwith. That the Sheriff of Allegheny County deputized two of the petitioners, N. S. Snyder and M. Harrison, to serve said writ. That they arrested said S. V. Davis at Warren by virtue of said writ, and were proceeding

with him to Pittsburgh, when at Kane he was forcibly rescued from their custody and returned to his home. That this rescue was the subject of public rejoicing in the County of Warren and was published in inflammatory articles in the newspapers of said county and circulated and read in said county.

That on the 8th of September, 1883, the Sheriff of Allegheny County made his return to the attachment showing the arrest and rescue, and thereupon the said Court of Common Pleas, No. 1 of Allegheny County, issued an alias writ of attachment for the said S. V. Davis, by virtue of which John Doyle, a Deputy Sheriff of Allegheny County, arrested the said S. V. Davis at Warren. That the President Judge of Warren County issued a writ of *habeas corpus* directing that the said S. V. Davis should be brought before him, and that after hearing he directed that he be discharged from the custody of the Deputy Sheriff of Allegheny County, which was accordingly done.

That H. P. Ford had no connection with the arrest of the said S. V. Davis, other than being a party plaintiff to the record in the case in the Common Pleas of Allegheny County. That R. A. Balph had no connection with the arrest of the said S. V. Davis other than being one of the counsel of H. P. Ford. That M. Harrison and N. S. Snyder had no connection with the matter other than the service of the attachment in their official capacity.

That a fair and impartial trial cannot be had before the said judge, no allegation or charge is made against his honesty, and before a jury of Warren County, nor at a trial to be held in the said county or in the neighborhood thereof. That no relief is afforded them to secure a change of venue by any Act of Assembly.

The Commonwealth by Wm. Swanson, District Attorney of Warren County, filed an answer to the petition upon which the rule was granted, setting forth *inter alia* that the jurisdiction of the Court of Common Pleas of Forest County over the real property had attached six months before the bill of Sarah Ann Ford was filed in the Court of Common Pleas, No. 1 of Allegheny County. That while Samuel Lewis was appointed receiver he never took legal possession of said property. That S. V. Davis as receiver did take peaceable and undisputed possession of said property. That the said S. V. Davis as receiver made application to the Court of Common Pleas of Forest County and obtained a restraining order restraining the said Samuel Lewis from interfering with said property, which order and injunction the said Samuel Lewis had openly and notoriously violated. That in July, 1883, after hearing, the Court of Common Pleas, No. 1, of Allegheny County, refused

[Commonwealth v. Balph.]

an attachment for contempt for S. V. Davis. That the attachment of June, 1883, was issued without taking testimony.

That this writ of attachment was placed in the hands of the said S. N. Snyder and M. Harrison, who executed the same beyond the territorial jurisdiction of the officer to whom it was directed, that they were not deputized by the Sheriff of Allegheny County, and were acting as private detectives without authority of law, and kidnapped and abducted the said S. V. Davis. That the said S. V. Davis was not rescued as alleged in the petition.

That from the second arrest the President Judge of the Court of Common Pleas of Warren County legally, upon hearing, discharged the said S. V. Davis. That there is no reason why the petitioners may not have a fair and impartial trial before the said judge, before a jury of Warren County in Warren County.

That the defendants are guilty of the misdemeanors for which they are indicted, as will be shown by evidence at the trial. That the bill was found at September Sessions, 1883, and that the trial of the case has been continued to the present time, and that the petitioners are therefore guilty of gross *laches.*

*D. T. Watson, John Dalzell, W. C. Moreland* for the rule.—

The jurisdiction of the Supreme Court over all the criminal courts of the State is undoubted. For one hundred and fifty years the right of a judge of the Supreme Court to allow the writ of *certiorari* to remove an indictment before trial has been settled. This was provided for by Act of 22d May, 1722: 1 Sm. Laws, 139.

This Act substantially re-enacted by the Act of June 16th, 1836, P. L. 784, gave to the Supreme Court and the judges thereof, all the power of the Kings's Bench of England: Commonwealth *v.* Nathans, 5 Barr, 125; Commonwealth *v.* Simpson, 2 Gr., 439; Commonwealth *v.* Ickoff, 9 C., 80. This right was recognized in the constitution of 1790: Art. V., § 5.

Not contented with the statute of 1722, the legislature under the direction of the constitution of 1790 enacted the Act of 13th April, 1791: 3 Sm. Laws, 30; providing for the removal of the indictment and all proceedings thereupon into the Supreme Court by writ of *certiorari.*

The Act of 16th June, 1836, P. L. 784, rescinded the law of 1791, omitting the clause requiring the allocatur:

The Act of 1791 is still in force unaffected by the Act of 1836: Commonwealth *v.* McGinnis, 2 Wh., 117.

The Act of 1791 is re-enacted almost in words in our Criminal Code, Act of March 31st, 1860, P. L. 437.

1 AMERMAN—24

[Commonwealth *v.* Balph.]

In Com. *v.* Drum, 8 P. F. S., 11, a true bill for murder had been found. The President Judge certified to the Supreme Court that his relation to the defendant would be in the way of his presiding at the trial. The Supreme Court sent AGNEW, J., to hold the Court.

The King's Bench was always ambulatory and removed with the King wherever he went and hath always retained jurisdiction in criminal matters: Bacon's Abridgment, title, Court of King's Bench.

When it sits in any county it supersedes any Court there sitting: 4 Black. Com., p. 266.

The Court of King's Bench frequently tried indictments found in one county in another: 2 Hales Pleas of the Crown, 215; King *v.* Inhabitants of Nottingham, 2 Levinz, 112; Rex *v.* Harris et al., 3 Burrows, 1332; King *v.* Inhabitants of Cumberland, 6 Term., Rep., 194; Rex *v.* Cowle, 2 Burrows, 859.

The same power is exercised by the Supreme Courts of the different states: People *v.* Vermilyea, 7 Cowan, 137; Kendrick *v.* State, 1 Cooke's Rep., 475; Bob, a Slave, *v.* The State, 2 Yerg., 176; State *v.* Hunt, Coxe Rep., 287; State *v.* Gibbons, 1 Southard, 41; Nicholls *v.* State, 2 Southard, 539; The State *v.* The Judges, 3 Harris & McHenry, 115.

The Constitution of 1874, contains no express repeal of the statutes allowing the *certiorari*, they stand as part of the law of the state: County of Allegheny *v.* Gibson, 7 W. N. C.; 441.

*Wm. Swanson*, (District Attorney), *S. P. Johnson, A. B. Richmond, J. M. Stoner, A. B. Force*, against the rule.—The constitution of the state prohibits the exercise of any original jurisdiction by the Supreme Court except in the cases specified: Art. V. § 3, Const.

The judges of the Supreme Court shall by virtue of their offices be Justices of Oyer and Terminer, and General Jail Delivery in the several counties: Art. V. § 3, Const.

The meaning of this is plain. It does not warrant the trial of criminal causes originating in one county by a Judge of the Supreme Court sitting in another county.

A Judge of the Supreme Court, when exercising the functions of a Justice of Oyer and Terminer must sit in the county in which the indictment was found.

This construction is determined by Com. *v.* Ickhoff, 9 C., 80, Com. *v.* Drum, 8 P. F. S., 9. The constitution of 1874 is the same as that of 1838 in this respect.

Before the Courts of *nisi prius* were abolished, it was held that the Supreme Court had power to allow Courts of *nisi prius* for the trial of criminal cases in the proper counties,

where the indictment has been found and was pending : Com. v. Frowenfield et al., 3 Grant, 99.

There has not been shown such a case as to warrant this extraordinary exercise of authority on the part of the Court.

Mr. Justice PAXSON delivered the opinion of the Court, January 4th, 1886.

On March 1st, 1884, the defendants below presented a petition to this Court praying us to issue a writ of *certiorari* to the Quarter Sessions of Warren County to remove into this Court the indictment and record of a certain case of the Commonwealth v. R. A. Balph, Henry P. Ford et al. The defendants were indicted for conspiracy and assault, and the ground upon which the removal was asked was that the defendants could not have a fair trial in Warren County for certain reasons set forth in the said petition. Without entering into detail, it is sufficient to say that the case arose out of a conflict of jurisdiction between the Court of Common Pleas of Warren County and the Court of Common Pleas No. 2, of Allegheny County, in regard to the appointment of a Receiver, culminating in the appointment of such officer by each court, and an attempt by each to enforce its own orders and decrees. So far did this proceed that the Court of Warren County discharged upon habeas corpus a person adjudged guilty of contempt by the Court of Allegheny County, and who was in custody under an attachment. The petition further averred that a fair and impartial trial before a judge and jury of Warren County could not be had because of the excitement and prejudice existing against them in said county, not only on the part of the public generally, but by the jurors likely to be empannelled in the cause, and the judge before whom the case would be tried.

For the purposes of this case we must assume the statements of the petition to be true. And even if the petitioners are mistaken in whole or in part in their allegations of prejudice, the fact that they have thus publicly challenged for cause the presiding judge, would place the latter in a very unpleasant position were he called upon in the course of his official duty to try the cause. Upon this point we cannot do better than to quote the remarks of LEWIS, J., in a similar application made to this court by one Derringer in 1857. He says: "If it had been material to produce the statement of the judges, I see no reason why it should not be produced, as the time was ample. I see, therefore, no reason for continuing the cause. As the matter strikes me, a statement of the judges in opposition to the affidavit would not be material. If what Mr. Derringer says in his affidavit be true that two of them (the judges)

expressed themselves in such a manner as to render a trial before them very unfair to the accused, it would be very improper for them to try this cause.    If his statement against them be false we may well suppose the feeling which that statement would make in the breast of those judges.    We cannot control human nature, and when a judge has a man before him who has made a false charge against him, it is almost impossible to administer justice fairly.    I think it would be very unfair under these circumstances to expect either of these judges to try the cause.    They should be the last ones to whom to apply.    Whether the affidavit be true or false, it seems to me a good reason for asking them not to decide."

Under all the circumstances as developed by this petition, we think the judges of Warren County ought not to be called upon to sit in this cause.    In saying this we wish it distinctly understood that we in no way reflect upon him as a judge or as a man.    And we are of opinion that sufficient facts are averred as to render it extremely doubtful whether an impartial trial can be had before a Warren County jury, and that the cause is one which would justify us in removing it if we have the power.

This brings us at once to the vital question whether such power still exists in this court.    I say still exists, because no one doubts the power was lodged in this court up to and until the adoption of the present constitution.    It has been not only asserted, but exercised repeatedly.    Causes have been removed into this court and tried by several of the judges who have preceded us.    For over one hundred and fifty years the right of a judge of this court to allow the writ of *certiorari* to remove an indictment before trial has been settled beyond controversy.

The question as now presented is one of grave importance, and we have given it the most careful attention.    It has been held under advisement for over one year, as it was of far more importance that the principle should be carefully and intelligently decided than that it should be done speedily.    The delay of one not very important case is of less consequence than the settling of an important principle which is to be a rule of action for all time.

It is necessary to an intelligent discussion of the subject to review to some extent the past legislation of the state.    I will do so as concisely as is consistent with its proper understanding.

As early as May 22d, 1722, we have an Act (1 Smith's Laws, 139), the eleventh section of which provided:  "That there shall be holden and kept at Philadelphia, a court of record twice in every year; that is to say, on the twenty-

fourth day of September and the tenth day of April, if the same days or either do not happen to be on the first day of the week, and in such case the said court shall be held on the next day following; which said court shall be called and styled The Supreme Court of Pennsylvania. And that there shall be three persons of known integrity and ability, commissionated by the Governor, or his Lieutenant for the time being, by several distinct patents or commissions, under the great seal of this Province, to be Judges of the said court, one of whom shall be distinguished in his commission by the name of Chief Justice. And every of the said Justices shall have full power and authority, by virtue of this Act, when and as often as there may be occasion, to issue forth writs of habeas corpus, certiorari and writs of error, and all remedial and other writs and process, returnable to the said court, and grantable by the said Judges by virtue of their office, in pursuance of the powers and authorities hereby given them."

And by section 13 of said Act it was further provided: " That the said Judges, or any two of them, shall have full power to hold the said court, and therein to hear and determine all causes, matters and things cognizable in the said court, and also to hear and determine all and all manner of pleas, plaints and causes, which shall be removed or brought there from the respective General Quarter Sessions of the Peace, and Courts of Common Pleas, to be held for the respective counties of Philadelphia, Chester, Bucks, as also for the city of Philadelphia, or from any other court of this Province, by virtue of any of the said writs: and to examine and correct all and all manner of errors of the Justices and Magistrates of this Province, in their judgments, process and proceedings in the said courts, as well as in all pleas of the Crown, as in all pleas, real, personal and mixed; and thereupon to reverse or affirm the said judgments as the law doth or shall direct, . . . . . and generally shall minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever as the Justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster or any of them, may or can do."

The constitution of 1790 distinctly recognized the same right. Section 5, of Article 5 provides that: " The Judges of the Courts of Common Pleas in each county shall, by virtue of their offices, be Justices of Oyer and Terminer and General Jail Delivery for the trial of capital and other offenders therein; any two of the said Judges, the president being one, shall be a quorum; but they shall not hold a Court of Oyer and Terminer or Jail Delivery in any courts where the judges

of the Supreme Court, or any of them shall be sitting in the same county. The party accused, as well as the Commonwealth may under such regulations as shall be prescribed by law, remove the indictment and proceedings, or a transcript thereof into the Supreme Court."

Then came the Act of 13th April, 1791 (3 Smith's Laws, p. 30), following immediately after the constitution of 1790, and carrying out its provisions, by the seventh section of which Act it was provided: " That whensoever any person shall be indicted in any Court of Oyer and Terminer, Goal Delivery or Sessions of the Peace, the party charged shall be at liberty to remove the said indictment, and all proceedings thereupon, or a transcript thereof into the Supreme Court, by a writ of certiorari, or by writ of error, as the case may require. Provided always, that no such writ of certiorari, or writ of error shall issue or be available to remove the said indictment and proceedings thereupon, or a transcript thereof, or to stay execution of the judgment thereupon rendered, unless the same, shall be specially allowed by the Supreme Court, or one of the Justices thereof upon sufficient cause to it or him shown, or shall have been sued out with the consent of the Attorney General ; which special allowance or consent shall be in writing, and certified on the same writ."

The Act of 16th of June, 1836, P. L., 785, substantially re-enacted the law of 1791, omitting, however, the provision requiring a special allocatur. The seventh section of said Act provides that, " The Judges of the Supreme Court shall have full power and authority, when and as often as there may be occasion, to issue writs of habeas corpus, writs of certiorari and writs of error, and all remedial and other writs and process, returnable to said court." And by section 9 it is provided that : "Every person indicted in any court of Quarter Sessions, or in any county court of Oyer and Terminer and General Jail Delivery, may remove the indictment, and all proceedings thereon, or a transcript thereof, into the Supreme Court by a writ of certiorari, or a writ of error, as the case may require."

It was at one time contended that the above recited Act of 1836 repealed the Act of 1791, and that inasmuch as the Act of 1836 contained no clause requiring a special allocatur, the writ of certiorari could be issued as of course in any case. That such a construction would have buried the Supreme Court beneath an avalanche of criminal business, as well as have seriously embarrassed the administration of justice was patent to the dullest comprehension. This question, however, was put at rest by The Commonwealth *v.* Ginnis et al., 2 Wharton, 113, in which it was held that the Act of 16th of June, 1836, relating to the jurisdiction and powers of the

court did not repeal the seventh section of the Act of 13th of April, 1791, regulating the removal of indictments into the Supreme Court, and that a special allocatur was still necessary to authorize such removal.

Our revised criminal code of 1860 re-enacted the Act of 1791 almost in terms. The 33d section of the Act of 31st March of that year (P. L., 439) provides: "Every person indicted in any Court of Quarter Sessions, or in any county court of Oyer and Terminer and General Jail Delivery, may remove the indictment, and all proceedings thereon, or a transcript thereof into the Supreme Court by a writ of certiorari, or a writ of error, as the case may require: *Provided*, That no such writ of certiorari or writ of error shall issue, or be available to remove the said indictment and proceedings thereupon, or a transcript thereof, unless the same shall be specially allowed by the Supreme Court, or one of the justices thereof, upon sufficient cause to it or him shown, or shall have been sued out with the consent of the Attorney General; which special allowance or consent shall be in writing, and certified on the said writ."

Here endeth our legislation upon this subject. It will thus be seen that the right of this court, or a judge thereof, to issue the writ of certiorari is distinctly recognized by the constitution of 1790 and by three Acts of Assembly. There never was a time since the passage of the Act of 1722, when this right was not to be found upon our statute books. It has existed practically unchallenged for over one hundred and fifty years. If taken away at all it is by the constitution of 1874. Before I discuss that question I propose to consider the object and effect of a removal of a criminal case into this court, and the power of the court in the premises.

It will be observed that the Act of 1722 expressly confers upon this court the powers of the King's Bench in criminal cases. This is plain from the language of the act itself, and authority is scarcely needed for so plain a proposition. That there may be no doubt, however, upon this question I will refer to the case of the Commonwealth *v.* Simpson, 2 Grant's Cases, page 438, where the Act of 1722 was under consideration and the construction I have indicated placed upon it by this court.

What are the powers of the King's Bench as it existed in England, where the Act of 1722 was passed? We all know in a general way that it was the Supreme Court of Oyer and Terminer and General Jail Delivery; that when it sits in any county it outranks and supersedes any other criminal court there sitting. It was always ambulatory and followed the

King's person. In contemplation of law the King sits there in person; at one time he sat therein in point of fact.

Henry III. sate in person with the justices in Banco Regio at the arraignment of Peter de Rivallis: Speed., 521. At another time the same king sat there in person at the arraignment of Hubert, Earl of Kent: Speed., 524. But the King never took part in the trial; that was committed to his judges. Yet the fact of his actual or supposed presence in the court gave to the latter great dignity and importance.

In Sharswood's Blackstone, Book III., page 42, the court of King's Bench is thus described: "The jurisdiction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition. It takes cognizance both of criminal and civil causes; the former in what is called the crown side, or crown office; the latter in the plea side of the court."

And in Book IV. of the same work, at page 265, we find the following in regard to its powers on the crown side: "The court of King's Bench, concerning the nature of which we partly inquired in the preceding book, was (we may remember) divided into a crown side and a plea side. And on the crown side or crown office it takes cognizance of all criminal causes, from high treason down to the most trivial misdemeanor or breach of the peace. Into this court also indictments from all inferior courts may be removed by writ of *certiorari*, and tried either at bar or at *nisi prius* by a jury of the county out of which the indictment is brought."

"Also, this court, by the plenitude of its power, may as well proceed on indictments removed by *certiorari* out of inferior courts, as on those originally commenced here, whether the court below be determined, or still *in esse*, and whether the proceedings be grounded on the common law, or on a statute making a new law concerning an old offence:" Bacon's Abridgement, vol. 2, page *142, title, Court of King's Bench.

"Also, it hath so sovereign a jurisdiction in all criminal matters, that an Act of Parliament, appointing that all crimes of a certain denomination shall be tried before certain judges, doth not exclude the jurisdiction of this court, without express negative words; and therefore it hath been resolved that 33 Hen. VIII., cap. 12, which enacts, that all treasons, &c., within the King's house, shall be determined before the lord steward

[Commonwealth v. Balph.]

of the King's house, &c., doth not restrain this court from proceeding against such offences:" Id.

To the same point are Brice's Abridgement and other English text-books, and decisions without number. The power of the King's Bench is well and accurately defined, and is not a subject of dispute. It possesses the inherent power of removing by *certiorari* the record and proceedings of any criminal case from the inferior court at any stage of the proceedings. After a case has been so brought into the King's Bench it may be tried at bar, or at *nisi prius* by a jury from the county from which the record was brought, or if it is suggested upon the record and proof by an affidavit, that an impartial trial cannot be had in such county, the record may be remanded to another county for trial. The latter is an important provision as it amounts practically to a change of venue, and may take place in cases when no such change is given by statute. It requires, therefore, careful consideration. If I show that it exists in the King's Bench, I show that it exists here, unless taken away by express words of the Constitution or Act of Assembly.

In the case of Rex *v.* Cowle, 2 Burrow's Report, 734, that great criminal lawyer, Lord MANSFIELD, at that time Chief Justice of the King's Bench, laid down the rule as follows. "But the law is clear and uniform, as far back as it can be traced . . . . . that in parts of England itself, when an impartial trial cannot be had in the proper county it shall be tried in the next: as 5 G. 1., Rex *v.* Inhabitants of the county of the City of Norwich, about the county bridges, the trial was in Suffolk." This is the ancient and general rule whereon the court has jurisdiction."

In Rex *v.* Harris, 3 Burrows, 1330, the application to remove the record to an adjoining county for trial was refused upon the ground that the facts did not warrant it. All the judges, however, were of opinion that they had the power to order such removal. Such order was made in the King *v.* The Inhabitants of Nottingham, tried before Lord Chief Justice Hale, 2 Levinz, 112; see Hale's Pleas of the Crown, page 215 and note. The same rule was laid down in the King *v.* Inhabitants of the County of Cumberland, 6 Term Reports, 194 (decided in 1794), and numerous other cases will be found cited in the opinion of the court.

This is the settled law of England, and in this country, in those states in which the Supreme Court is clothed with King's Bench powers the same rule prevails. Thus in New York, in The People *v.* Vermilyea, 7 Cowan, 137, where an indictment had been removed by a *certiorari* into the Supreme Court for trial, and the defendant moved for a change of the place of

trial, it was said by Chief Justice SAVAGE: "Changing the venue, technically speaking, is out of the question. The course in criminal prosecutions when a clear case is made out, is to order a suggestion upon the record that a fair and impartial trial cannot be had in the county where the offence is laid. A venire is then awarded to the sheriff of another county, and the case tried there, the indictment remaining unaltered as to the venue." WOODWARD, J., concurred in the decision and said: "There is no doubt of our power upon a proper case to send a criminal cause down for trial to a county other than that in which the venue is laid. Hence, the venue as such cannot be changed. The place of trial must be altered by suggestion, and on clear proof that the cause cannot be tried in the county where the offence is laid with safety to the rights of the defendants."

The same rule exists in Tennessee. In Kendrick *v.* State, 1 Cooke's Rep., 475, it was held, citing the English cases above referred to, that when it was made to appear to the Supreme Court, upon the removal of an indictment, that a fair trial cannot be had in the county where the venue is laid, the place of trial will be changed. And in Bob, a Slave, *v.* The State, 2 Yerger, 176, it was held that as the judges of that court were clothed with all the powers of the King's Bench, they could issue a *certiorari* to a lower court to remove the record of a criminal case for trial, PECKS, J., saying: "In England there is no question the *certiorari* would lie in such a case, either before or after judgment. Before judgment in a case made out that because of the public clamor, justice could not in all likelihood be done the person charged in the county where charged."

In New Jersey the same doctrine was held in The State *v.* Hunt, Coxe's Rep., 287; State *v.* Gibbons, 1 Southard, 41; Nicholls *v.* The State, 2 Id., 539, and in Maryland in The State *v.* The Judges, 3 Harris & McHenry, 115.

I need not refer to the line of cases in our books in which this Court has exercised the power of issuing a writ of *certiorari* to the court of Oyer and Terminer and Quarter Sessions of the Peace throughout the state, and thus removed indictments here for trial. Some of them have been tried; others have been left to slumber in forgetfulness. This, however, was doubtless, owing to the fact that no one pressed such cases for trial; the zeal of the parties for a speedy trial diminishing, as the prospect for a trial before an impartial court and jury increases.

From the foregoing I take it to be clear that up to and prior to the adoption of the constitution of 1874, this court possessed the inherent power of issuing writs of *certiorari* to

remove criminal cases; to try such cases at bar in any district where it might chance to be sitting, or send it for trial at *nisi prius;* and upon sufficient cause shown to send it for trial to a county other than the one in which the indictment was found. And not only was such power inherent in the courts, but the power to remove indictments has been, from time to time, expressly conferred by Act of Assembly. There never has been a period since the court was first organized that it did not exist, and the statutes conferring it have never been expressly repealed. Have they been repealed by implication? It would be a novel doctrine to hold that important powers which have been exercised by the highest judicial tribunal in the state for over one hundred and fifty years, not only permissively, but by the express command of the statute, can be taken away by mere implication. The suggestion of such a principle carries with it its own refutation. But the law upon this subject is not uncertain. Just here, it is well to bear in mind, that the question of our power to issue the writ of *certiorari*, and our power over the case after the removal of the Record into this court, are separate questions. I will consider the latter branch of the case when I reach it. At present I am upon the question of the power to issue the writ.

The writ of *certiorari* is a writ of common right, to be taken away not by implication, but only by express words: Mauch Chunk *v.* Nescopeck, 9 Harris, 46; Rex. *v.* Moreley, 2 Burr., 1040; and in Overseers of the Poor *v.* Smith, 2 S. & R., 363, it was held that the jurisdiction of the Supreme Court can be taken away only by express words, or irresistible implication. We might multiply authorities indefinitely upon this point were it necessary. It is sufficient to refer to the late case of County of Allegheny *v.* Gibson, 9 Norris, 397, where the subject of the effect of the new constitution upon existing laws is discussed at length.

The constitution of 1874 contains no express repeal of either the Act of 1836 or 1860 conferring upon this court the power to issue the *certiorari*. Nor is there a word in it from which such repeal can be irresistibly implied, or implied at all. We are of opinion that said Acts are in full force.

It is urged, however, that if the right to issue the writ technically exists, yet we have no power to try or control the case after it is brought here, and attention is called to the 3d section of Article 5 of the Constitution, as taking away our power in this respect. If in point of fact we have no power over a case after it is brought here, it would be a persuasive argument against the power to bring it here, as we do not propose to do a vain thing, nor does the law contemplate that we should.

The portion of the constitution referred to is as follows: "The jurisdiction of the Supreme Court shall extend over the state and the judges thereof shall, by virtue of their offices, be Justices of Oyer and Terminer and General Jail Delivery in the several counties; they shall have original jurisdiction in cases of injunction where a corporation is a party defendant, of habeas corpus, of mandamus to courts of inferior jurisdiction, and of *quo warranto* as to all officers of the Commonwealth whose jurisdiction extends over the state; but shall not exercise any other original jurisdiction; they shall have appellate jurisdiction by appeal, *certiorari* or writ of error in all cases, as is now or may be hereafter provided by law." In the consideration and discussion of this section of the constitution I throw out of view the copious citations which have been furnished us from the debates in the convention. They are of value as showing the views of individual members, and as indicating the reasons for their votes. But they give us no light as to the views of the large majority who did not talk; much less of the mass of our fellow citizens whose votes at the polls gave that instrument the force of fundamental law. We think it safe to construe the constitution from what appears upon its face. Nor do we propose to go beyond the necessities of this case. Other delicate questions may arise in the future upon this section, and we leave them until they are presented.

From this section we may gather with reasonable certainty the following: (1) That the jurisdiction of the Supreme Court extends over the entire state; (2) That the justices thereof are *ex officio* judges of the Oyer and Terminer in every county of the Commonwealth and, (3) That the original jurisdiction of the court, excepting in the excepted cases, is abolished.

The first two propositions are not new. They existed in prior constitutions, and conferred no additional power. The third is a limitation of our power as formerly exercised, by taking away a portion of our original jurisdiction. That it was intended to sweep away the court of *nisi prius* in which our original jurisdiction had been generally, if not wholly exercised, was not left open to conjecture, as it is expressly declared by the 21st section of the 5th Article, that "the court of *nisi prius* is hereby abolished, and no court of original jurisdiction to be presided over by any one or more of the judges of the Supreme Court shall be established." It is contended that this language, in connection with the 3d section of Article 5 takes away all our powers as justices of the Oyer and Terminer. We do not so understand the constitution, nor does it so read. Conceding for the purposes of this case that we may no longer try a case brought into this court, at *nisi*

[Commonwealth v. Balph.]

*prius.* it is begging the question to say we may not try it at all. The constitution must be so read as to give effect to all its parts, and when it distinctly says that the judges of this court shall be *ex officio* justices of the Oyer and Terminer and General Jail Delivery in every county in the state, it means something. It is not an idle phrase inscribed for mere sound, or to fill up space. It was not new; it was taken literally from the constitution of 1838. It was known to the convention that this court had in several cases placed a construction upon this clause. It is sufficient to refer to a single case: Com. *v.* Ickhoff, 9 Casey, 80, in which it was distinctly held that "each of the judges of this court has power to hold a court of Oyer and Terminer and General Jail Delivery in any county of the state." It was said by Chief Justice LOWRIE: "This is a cause in the Oyer and Terminer, and the president judge, within whose jurisdiction it falls, represents to us that there is a legal impediment that prevents him hearing it, and asks us to send one of the judges of this court to try it. We think that we are bound to do so. We know of no legal or constitutional authority for any judge of the Common Pleas to hold a court of Oyer and Terminer out of his district, and when such a court is held by judges of the Common Pleas it requires two to make a quorum, the president being one. But the jurisdiction of this court extends over the whole state, and its judges are, by virtue of their office, Justices of Oyer and Terminer and General Jail Delivery in the several counties; and the judges of the Common Pleas cannot hold an Oyer and Terminer, or Jail Delivery Court, while the Supreme Court or any of them are sitting in the same county for criminal trials: Const., Art. V., §§ 4, 5. This makes it appear plain that each judge of this court has power to hold a court of Oyer and Terminer, or of General Jail Delivery, in any county of the state. They are severally justices for this purpose, and no quorum being established, each of them has full and equal authority to hold such courts. Any of them sitting in the same county excludes the jurisdiction of the Common Pleas judges, and this can mean no less than that any one of them has jurisdiction, and therefore excludes all other jurisdictions that are not superior."

That the same power exists now is beyond all controversy. From all that has been said it would seem to be clear that the only change which the constitution makes in our powers in criminal cases, is to prevent our trying indictments in the *nisi prius.* That court is dead without the hope of resurrection. But each judge has the power to sit and try indictments in any county of the state.

Much less does the constitution affect the power inherent in

[Commonwealth *v.* Balph.]

this court, and expressly conferred by statute, of removing criminal cases into this court by certiorari. It is not strictly speaking original jurisdiction. A certiorari brings up a record for review; it is not the commencement of an original suit. The general powers of supervision over criminal cases inherent to the King's Bench, and expressly conferred upon this court by statute, means something more than the trial of the case before a jury. It means in its broadest sense that we shall see that every man charged with crime shall have a fair and impartial trial; that where it is made clear to us that a man cannot have such a trial, either from an excited and inflamed condition of the public mind in the county where the indictment was found, or from feeling or prejudice on the part of the judge, or any other sufficient cause, we shall issue our certiorari, remove the record into this court and send it down to another county for trial, and if necessary before one of the judges of this court. That it is a power to be exercised with extreme caution is admitted. That it may be abused is possible. But I can readily imagine circumstances in the future which would make the exercise of this power the only barrier between a good citizen and gross oppression. If the people shall be of opinion that it was unwisely conferred, or that it is being improperly exercised, they can change it by a modification of the fundamental law. The mere knowledge that such a power exists in this court it is believed will make its frequent use unnecessary.

The rule is made absolute; and it is ordered that the writ of certiorari issue as prayed for. When the record comes up we will be prepared to entertain a motion looking to a speedy trial of the cause.

Mr. Justice TRUNKEY delivered a dissenting opinion.

"The jurisdiction of the Supreme Court shall extend over the state, and the judges shall by virtue of their offices, be justices of Oyer and Terminer and General Jail Delivery in the several counties; they shall have original jurisdiction in cases of injunction when a corporation is a party defendant, of *habeas corpus*, of *mandamus* to courts of inferior jurisdiction, and of *quo warranto* as to all officers of the Commonwealth whose jurisdiction extends over the state, but shall not exercise any other original jurisdiction; they shall have appellate jurisdiction by appeal, certiorari, or writ of error, in all cases as is now or may hereafter be provided by law:" Constitution of 1874, Article V, sec. 3.

In one section the original jurisdiction of the Supreme Court is limited to four classes of cases, prohibited as to all others, and the appellate jurisdiction in judicial proceedings

is made as extensive as has been or may be provided by the legislature. Original jurisdiction has been defined thus: "Authority to take cognizance of a controversy in its first condition, and to try and determine the questions of fact, and apply the law, as distinguished from appellate jurisdiction;" and the latter thus: "Pertaining to the judicial review of adjudications. Appellate is used in a broader sense than appeal; thus appellate jurisdiction is the power to take cognizance of and review proceedings in the inferior court, irrespective of the manner in which they are brought up, whether by appeal, or by writ of error, or even by certiorari:" Abbott's Law Dict.

The Constitution clothes the Supreme Court with certain original jurisdiction, and legislation can confer it in no other cases. A statute may provide that said court may review interlocutory orders and judgments, as well as final judgments, but a provision that the court shall retain the cause for trial after such review would be void. Appellate jurisdiction is a continuation of the judicial power which has been executed in the court of original jurisdiction, it involves only a review, and if no error be found the judgment of the inferior court stands. But in case of reversal, if the proper judgment cannot be pronounced without the taking of additional testimony, or another trial to determine the facts, the appellate court settles the questions which were raised in the record and remands the cause to the court having original jurisdiction for further investigation and adjudication. If the appellate court also had original jurisdiction of such cause the case would be different.

It matters not how extensive was the original jurisdiction of the Supreme Court prior to the adoption of the constitution of 1874, for that names the classes of cases of which the court shall have such jurisdiction, and declares that it "shall not exercise any other original jurisdiction." This provision is utterly repugnant to all statutes conferring original jurisdiction on the Supreme Court in cases not within the specified classes. The provision is plain, in negative words, and there is no ground for avoiding it by construction or interpretation. Being a part of the organic law of the Commonwealth, it repeals prior repugnant statutes. It cannot rightfully be nullified by prior statutes or judicial decisions. No legislation is necessary to carry the repeal into effect. The direct security of rights, and the positive prohibition of acts, where legislation is not manifestly contemplated for the enforcement thereof, are valid and effective from the adoption of the constitution: In re Grape Street, 13 W. N. C., 377; Pierce *v.* Commonwealth, 14 Id., 97. Other cases might be cited, among them, Pusey *v.* City of Allegheny, 98 Pa. St., 522, where it was re-

[Commonwealth *v.* Balph.]

marked of Art. XVI, sec. 8: "This being now the supreme law of the land, it must govern the case under consideration; and it is idle to recur to decisions and legislation, the authority of which as to all present and future cases, is, by this provision, annulled."

None of the prior constitutions contained a limitation and prohibition of original jurisdiction. That of 1776 provided that the Supreme Court, besides the powers usually exercised by such courts, should have certain powers of a court of chancery, "and such other powers as may be found necessary by future General Assemblies, not inconsistent with this constitution." And similar provision was in the constitutions of 1790 and 1838. Under all of them the power of the legislature to confer original jurisdiction upon the Supreme Court was unrestricted. That power was liberally exercised, as may be seen in the opinion of the court in Commonwealth *v.* Simpson, 2 Grant, 439, and in the dissenting opinion by Justice READ, in Commonwealth *v.* Frowenfield, 3 Grant, 99. Among the powers conferred were those of the Court of King's Bench in England. Now the original jurisdiction of the Supreme Court is limited by the constitution to specified cases, and prohibited in all others.

The constitution of 1790 provided that there should be a Court of Oyer and Terminer and General Jail Delivery in each county, and that the judges of the Court of Common Pleas in each county should by virtue of their offices, be justices of the Court of Oyer and Terminer and General Jail Delivery. This provision was in the constitution of 1838; and it is in the present, with the modification that the judges of the Court of Common Pleas, learned in the law, shall be judges of the Court of Oyer and Terminer. Since 1790 there has been the same constitutional provision respecting the extent of the jurisdiction of the Supreme Court, and that "the judges thereof shall, by virtue of their offices, be justices of Oyer and Terminer and General Jail Delivery in the several counties." By virtue of the constitution a Court of Oyer and Terminer exists in each county. It is not a creation of the legislature. The judges of the Common Pleas, by virtue of their offices, are judges of the Oyer and Terminer, but their duties and powers as judges of that criminal court are the same as if they were not also judges of another court. The Oyer and Terminer has original jurisdiction in criminal cases, and its judges have no greater power respecting its business than they would have if not also judges of the Common Pleas, or of the Supreme Court. When one or more of the judges of the Supreme Court act as judges of the Court of Oyer and Terminer in any county, they exercise the duties

[Commonwealth *v.* Balph.]

and powers of judges of that court, neither more nor less, and their proceedings and judgments are subject to review by the Supreme Court, same as if said criminal court was held by any other judges thereof.

I have referred to the questions of jurisdiction, believing they bear on the propriety of granting the petition of the defendants. If no error be shown in the proceedings of the Court of Quarter Sessions which ought to be corrected at this stage, it seems to me that the main result of interference by the appellate court will be delay. I believe that a court for the correction of errors cannot rightfully delay a trial in the court of original jurisdiction, when no error appears to have been committed. If it can, the state of the law relative to the trial of criminal causes, since the adoption of the present constitution, is no better than it was before. As the law stood before, this court could bring up causes from the inferior criminal courts and try them. In Commonwealth *v.* Simpson, supra, Justice BLACK said: "It is clear that we have the power of bringing criminal cases into this court for trial by certiorari, but we ought not to have it. It has never yet been exercised for the punishment of offenders, but it has often had the effect of screening them from justice. Of the numerous removals which have been made in fifty years, not one has resulted in conviction; and nine out of ten have never been tried. . . . . . I make these remarks in the hope of calling to the subject the attention of that department of the government which alone can give a remedy for what I am sure is a great evil." The legislature gave no remedy, but the constitution of 1874 did by prohibiting this court from exercising original jurisdiction, except in the cases therein named. What is that remedy worth if this court may delay the trial in the proper court? Is it not notorious that delay in bringing an offender to trial tends to his acquittal? During the delay the prosecutor may become weary, or satisfied, or the Commonwealth's witnesses lost; and then the offender will be ready for trial, and the District Attorney learns that he cannot adduce evidence to convict. In my opinion no certiorari should be issued by this court to arrest a trial and bring up a cause before final judgment in the court below, except for such error as must be corrected before the alleged offender could have a fair trial on the merits, and that such error ought to be shown prima facie at the time of application for the writ.

The petition in this case prays for a writ of certiorari to be issued to the Court of Quarter Sessions of Warren county, and upon its return that this court will proceed to the trial, decision and determination of the cause. It sets forth alleged facts tending to show that the defendants are not guilty of the

1 AMERMAN—25

offence charged in the indictment; that persons other than the defendants have acted badly, and in contemptuous defiance of the Court of Common Pleas of the county of Allegheny; that the presiding judge of said Court of Quarter Sessions has had his personal prejudices and pride aroused, and has made manifest his inability to preside impartially and with a due regard to the rights of the defendants; that if the case be tried in said county the jurors will be persons whose minds have been inflamed and prejudices excited against the defendants; and avers " that a fair and impartial trial cannot be had before the said judge and before a jury of Warren county, nor at a trial to be held in said county or in the neighborhood thereof where the said public excitement has prevailed."

The defendants admit that they are not entitled to a change of venue under any Act of Assembly. They do not allege any error in the record. Upon the verity of their showing no ground exists for action by the appellate court. Were this court to seize and try the cause it would be an exercise of original jurisdiction prohibited by the constitution. There being no error in the record, there is no cause for the writ. Cases have been cited which were removed into this court prior to 1874, where a court of *nisi prius* was ordered to be held in the proper county for the trial; all such cases were when this court had original jurisdiction, and before the court of *nisi prius* was abolished.

Authorities are abundant that the judges of this court, by virtue of their offices, may act as judges of the Oyer and Terminer in the several counties; but there is no authority that one or more judges of this court, when holding a court of Oyer and Terminer in a county, can remove a case to or from that county, which could not be so removed by the same court when held by one or more judges of the Court of Common Pleas. The jurisdiction and powers of the Court of Oyer and Terminer are defined by the laws. A judge of this court may go into the county of Warren and preside over the Court of Oyer and Terminer, and while he is there holding said court the judges of the Common Pleas shall not act as judges of the Oyer and Terminer. Had the petitioners requested that some of the judges of this court should hold a Court of Oyer and Terminer in the county of Warren, it might be considered whether their aspersions of the able and upright president judge of the Court of Quarter Sessions are cause for granting their request. Then it might be enquired, What power has the Court of Oyer and Terminer over a case pending in the Quarter Sessions, held by a judge of the Common Pleas, and which may be lawfully tried in the Quarter Sessions?

. The foregoing indicates the reasons why I was opposed to

the granting of the rule to show cause, and to the stay of proceedings in the court below, and why I would discharge the rule.

GORDON and CLARK, JJ., concur in this dissent.

PER CURIAM.—April 12th, 1886.—It is ordered that the indictment and proceedings be sent down to the Court of Quarter Sessions of Lycoming county with instructions to try the said indictment in all respects as if the same had been originally found in said court. Said trial to be on the 6th day of September next, unless upon legal cause shown said trial shall be continued, and shall be at the expense of Warren county.

Mr. Justice TRUNKEY dissented, and filed a dissenting opinion, in which GORDON and CLARK, JJ., concur.