# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

IN RE: 4,744 SUBPOENAS DUCES TECUM ISSUED BY THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE TO THE PHILADELPHIA POLICE DEPARTMENT

: No. 68 EM 2021
:
:
:
:
:
:

PETITION OF: THE PHILADELPHIA POLICE DEPARTMENT

:
:
:
:
:
:
:

## DISSENTING STATEMENT

**JUSTICE DOUGHERTY**                    **FILED: November 5, 2021**

As this Court has long recognized, our extraordinary and sweeping jurisdiction at King's Bench must be exercised with "extreme caution" due to the possibility of abuse. *Commonwealth v. Balph*, 3 A. 220, 230 (Pa. 1886). But caution does not mean inaction. "[T]he availability of the power is essential to a well-functioning judicial system." *Commonwealth v. Williams*, 129 A.3d 1199, 1206 (Pa. 2015). And it is this Court which bears the "ultimate responsibility to maintain the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system in Pennsylvania." *In re Bruno*, 101 A.3d 635, 683 (Pa. 2014). In this case, the Philadelphia District Attorney's Office (DAO) has served the Philadelphia Police Department (PPD) with thousands of subpoenas *duces tecum* in thousands of criminal cases seeking information from the personnel and disciplinary files of thousands of Philadelphia police officers. The purported purpose of the subpoenas is to assure the DAO's compliance with its disclosure

obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The DAO has additionally filed multiple contempt motions against the PPD in which it asks the lower court to order the PPD to disclose information in all pending criminal cases and to exercise judicial supervision of the PPD's disclosures. This dispute raises unsettled and important issues of state-wide significance regarding the extent of a prosecutor's subpoena powers and the interplay of these powers with *Brady* and *Giglio*. It also implicates important public interests in sound prosecutorial discretion, protecting the privacy of law enforcement officers, and effective law enforcement. Further, it portends lengthy litigation, widespread delays of criminal cases, wholesale dismissals, and the public dissemination of private information. While I recognize King's Bench review should be reserved for only the most extraordinary circumstances, in my opinion, this case presents them. Accordingly, I respectfully dissent from the Court's order denying the PPD's application for extraordinary relief.

In May 2021, the DAO used a "custom computer code" to identify cases appropriate for subpoenas. Commonwealth's Answer to the Philadelphia Police Department's Application for Extraordinary Relief Pursuant to the Court's King's Bench Jurisdiction (DAO Answer) at 9, *quoting* Declaration of Assistant District Attorney Michael Hollander. Then, on the evening of Friday, May 21, 2021, the DAO sent the PPD 4,744 subpoenas in 4,744 criminal cases. The cover letter for the subpoenas indicated the information was needed for "cases with court dates between June 1, 2021 and June 30, 2021." Motion for Contempt Sanctions, *Commonwealth v. Dontay Gilliam*, No. MC-51-CR-0019780-2020 (Gilliam Contempt Motion), Exhibit C at 1. The subpoenas seek information regarding 4,744 Philadelphia police officers. The subpoenas do not specify

the documents requested, nor do they provide case-specific grounds for the requests. Instead, they request the PPD to provide all documents responsive to a DAO protocol titled "Mission Statement and Request for Compliance Regarding Police Misconduct Disclosure (*Giglio* Information)." In addition, they include a generic paragraph asserting that the DAO is empowered to establish procedures for obtaining *Brady/Giglio* information, and the subpoenas have been issued pursuant to this power. The subpoenas request records from January 1, 1990 to the present.

On June 2, 2021, the PPD responded to the subpoenas. On August 11, 2021, the DAO filed motions to hold the PPD in contempt for making inadequate disclosures in six of the 4,744 cases in which it had issued subpoenas.[1] The contempt motions requested the court go "beyond directing the PPD to make an adequate response to the May 21, 2021 subpoenas, [and] order as part of its contempt remedy that the PPD produce the requested categories of potential *Giglio* material in *all* ongoing criminal cases, and monitor its compliance for a specified period of time." Gilliam Contempt Motion at ¶40 (emphasis in original). The contempt motions have been consolidated before the Honorable Lucretia Clemons of the Court of Common Pleas of Philadelphia County. Judge Clemons has scheduled the matter for an evidentiary hearing on November 10, 2021. She has "directed the Police Department to bring to the November 10th proceeding unredacted internal affairs files for the six officers whose records are at issue in the contempt litigation, so the Common Pleas Court can review the records with the assistance of testimony from

---

[1] *Commonwealth v. Dontay Gilliam*, No. MC-51-CR-0019780-2020; *Commonwealth v. David Gonzales*, No. CP-51-CR-0001197-2020; *Commonwealth v. Christopher Mendozza*, No. CP-51-CR-0001330-2020; *Commonwealth v. Brian King*, No. CP-51-CR-0008689-2019; *Commonwealth v. Carlos Monroe*, No. MC-51-CR-0008125-2021; and *Commonwealth v. Eric Watson*, No. CP-51-CR-0008632-2018.

a police witness who has knowledge of their contents." Notice of Additional Procedural Developments (Notice) at ¶2. On October 6, 2021, the PPD filed its application for extraordinary relief in this Court requesting we exercise our King's Bench jurisdiction over the matter.

Preliminary, I am unpersuaded by the DAO's argument the PPD is not authorized to bring this action in its own name. *See* DAO Answer at 16-18. "The exercise of King's Bench authority is not limited by prescribed forms of procedure[.]" *Bruno*, 101 A.3d at 669. Thus, any hypothetical issue with respect to PPD's authority to seek relief in this Court would not present any obstacle to the exercise of our King's Bench authority. Importantly, however, issues concerning the PPD's authority to litigate the case could conceivably frustrate conventional appellate review, which argues for the invocation of our King's Bench powers now.

Not only can we entertain the PPD's action, but the extraordinary, and surely unprecedented, circumstances here indicate we should. "This Court's 'King's Bench authority is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the ordinary process of law.'" *In re Domitrovich*, 257 A.3d 702, 715 (Pa. 2021), *quoting Friends of Danny DeVito v. Wolf,* 227 A.3d 872, 884 (Pa. 2020). The principal issue raised by this case is whether our decision in *Commonwealth v. Blakeney*, 946 A.2d 645 (Pa. 2008), applies to prosecutors. In *Blakeney*, we held that in order for a defendant to subpoena the personnel files of a police officer, he must "first articulate a reasonable basis for his request." *Id.* at 661. "[U]nfounded speculation" is not sufficient. *Id.* In addition, *Blakeney* holds "the strong public interest in protecting the privacy and safety of

law enforcement officers requires a narrowly targeted and supported request for relevant documents." *Id.* If *Blakeney* does apply to prosecutors, arguably all 4,744 subpoenas issued by the DAO must be quashed. Even assuming, *arguendo*, that the bare invocation of *Brady* and/or *Giglio* amounts to articulating a reasonable basis to access police personnel files rather than mere "unfounded speculation," none of the subpoenas are "narrowly targeted[,]" nor are any of them "supported request[s]." *Id.* No amount of *post hoc* argument or fact-finding will change this.

This issue implicates multiple important public interests. For one, it implicates the public's interest that prosecutors "exercise sound discretion in the performance of [their] functions." *Commonwealth v. Starks*, 387 A.2d 829, 831 (Pa. 1978) (quotation marks and citation omitted). Based on what has been filed with this Court to date, I find the DAO's actions here concerning. After business hours on a Friday, the DAO sent the PPD 4,744 subpoenas for the personnel files of an equal number of police officers. Since there are approximately 6,300 total officers on the force, *see* Philadelphia Police Department's Application for Extraordinary Relief Pursuant to the Court's King's Bench Jurisdiction (Application for Relief) at 6 n.5, the DAO subpoenaed the records of a staggering three-quarters of all officers employed by the PPD. The chronological scope of the subpoenas was also vast. The DAO sought any records dating back to January 1, 1990, more than three decades ago, and likely before many of the officers were even born. And the DAO left the PPD with very little time to respond to its subpoena dump. The cover letter for the subpoenas indicated the information was needed for court dates beginning on June 1, just six business days later. What's more, the DAO demanded information it already had. Indeed, in two of the six contempt petitions the DAO has filed against the PPD, it readily

admits the PPD previously supplied it with the subpoenaed officer information. *See* Gilliam Contempt Motion at ¶56 ("The PPD had previously provided the DAO with the above-referenced information concerning PO Fitzgerald, but failed to include it in its subpoena response."); Motion for Contempt Sanctions, *Commonwealth v. David Gonzales*, No. CP-51-CR-0001197-2020 at ¶56 ("The PPD had previously provided the DAO with the above-referenced information concerning Sgt. Schuck, but failed to include it in its subpoena response."). The DAO's subpoenas also encompassed cases it was not prosecuting but which instead were being handled by the Attorney General's Office, at least one case in which the defendant was dead, expunged cases, and cases long past the trial or guilty-plea stage.

The DAO's subpoena dump is particularly concerning because it implicates the courts. Each of the thousands of subpoenas generated by the DAO bears the seals of the Municipal Court and the Court of Common Pleas, as well as the signatures of the President Judges of these courts. The seals and signatures give the appearance the courts actually approved the DAO's subpoenas where, as the PPD asserts and the DAO does not dispute, this is "almost certainly" not the case. Application for Relief at 32; *see also United States v. Binh Tang Vo*, 78 F. Supp. 3d 171, 176 (D.D.C. 2015) ("Because subpoenas are issued with the Court's seal and backed by the threat of court-imposed sanctions, '[t]he mere fact that an attorney abuses the subpoena power directly implicates the court itself and creates an embarrassment for the institution.'"), *quoting United States v. Santiago-Lugo*, 904 F. Supp. 43, 48 (D.P.R. 1995).

The breadth of the DAO's subpoenas is matched by the sweeping relief it seeks in the contempt proceedings. The DAO is requesting the PPD be ordered to disclose police

personnel and disciplinary information in **all** pending criminal cases, even presumably any cases for which it has not actually generated subpoenas. In addition, it is asking for court supervision of the PPD's disclosure practices for an unspecified and open-ended period of time. As the DAO itself acknowledges, its motions for contempt sanctions and far-reaching injunctive relief against its chief law enforcement partner are "unprecedented." Gilliam Contempt Motion at ¶6.

This matter also involves "the strong public interest in protecting the privacy and safety of law enforcement officers[.]" *Blakeney*, 946 A.2d at 661. Indeed, pending before the Commonwealth Court *en banc* is a case in which police officers allege the PPD's disclosure of their personnel files to the DAO "violated their constitutional, statutory, and common law rights." Appellant's Brief in *Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 1295 CD 2019, at 25.

Further, this litigation touches upon "the public's interest in effective law enforcement." *Commonwealth v. Bing*, 713 A.2d 56, 58 (Pa. 1998). The matter pits Philadelphia's two leading law enforcement entities against one another in distracting, time-consuming, and resource-sapping litigation. This would present cause for public concern at any time, but is especially troubling now, as Philadelphia confronts historically high rates of murders and shootings, and the need for full cooperation between the DAO and PPD would seem to be at its maximum.

This clearly important case calls for our immediate intervention to ensure the efficient administration of justice. Absent our involvement, there is the real risk that many thousands of criminal cases will be delayed, likely significantly, irrespective of how the contempt proceedings are resolved below. If Judge Clemons finds the PPD to be in

contempt, the ruling(s) would be immediately appealable under the collateral order doctrine. *See College Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 208 (Pa. 1976) ("[A] contempt order is final and appealable when it is entered."). Indeed, the PPD indicates this is exactly what it would do in the event of contempt sanctions. *See* Application for Relief at 34 ("Orders granting contempt sanctions . . . would be appealable[.]"). The pendency of the PPD's appeal would formally stay any further action in the trial court with respect to the six cases consolidated before Judge Clemons. *See* Pa.R.A.P. 1701(a) ("[A]fter an appeal is taken . . . , the trial court . . . may no longer proceed further in the matter."). But far more dramatically, it would effectively stay the trial court proceedings in the 4,738 other cases covered by the DAO's subpoenas. While there remained a live question as to its legal obligation to do so, the PPD presumably would not make the requested disclosures in these numerous other cases either. And in the absence of these disclosures, the DAO would presumably not proceed further in these cases. The DAO asserts that it "takes its legal and ethical obligation to disclose [*Brady/Giglio*] information seriously." Gilliam Contempt Motion at 1 n.1. Accordingly, the DAO would not wish to proceed when, as its subpoenas would seem to indicate, it has a good faith belief there is undisclosed *Brady/Giglio* material.

For the same reason, Judge Clemons's denial of the DAO's contempt motions would also presumably delay thousands of criminal cases. In this circumstance too the DAO would be left without the information it seeks, and would presumably not pursue prosecutions in spite of its perceived inability to fulfill its constitutional disclosure obligations. Because this unprecedented dispute between the DAO and PPD appears destined to delay thousands of criminal cases in Philadelphia, delay which would come

on top of the already substantial backlog created by the COVID-19 pandemic, I submit our immediate intercession is essential. Indeed, thousands of delayed cases could lead to wholesale dismissals under the criminal prompt trial rules, Pa.R.Crim.P. 600 and Pa.R.Crim.P. 1013.

Moreover, it would appear that the scheduled evidentiary hearing before Judge Clemons will result in the public airing of police personnel and disciplinary information. The notice we have received from the PPD regarding the hearing, to which the DAO does not object, does not indicate the unredacted internal affairs records will be reviewed by the court *in camera*, or that the testimony of the police officer with knowledge of their contents will be closed to the public. *See* Notice at ¶2. The ongoing litigation in the trial court risks other public disclosures as well. The PPD informs us that in addition to filing motions to quash the subpoenas in the six contempt cases, it will be filing quashal motions or motions for protective orders in other cases as well. *See id.* at ¶3. These additional filings may engender public hearings of their own. The danger of public disclosure of private information likewise counsels for our immediate intervention.

In sum, in my view we can and should intervene in this case to address what is potentially a serious abuse of the subpoena process, and forestall the prospect of lengthy litigation between Philadelphia's two principal law enforcement entities, extensive delays in Philadelphia's criminal justice system, dismissals of criminal prosecutions, and public dissemination of privileged information.[2] Accordingly, I respectfully dissent.

Justice Todd and Justice Mundy join this Dissenting Statement.

---

[2] While I believe the preferable course would be for the Court to grant the PPD's present application and intervene now, I also acknowledge there is no bar to the PPD reapplying to this Court for extraordinary relief following additional developments in the lower court.