[J-6-2025] [MO: Dougherty, J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 32 EM 2023 |
| | : | |
| | : | On King's Bench petition from the |
| v. | : | order of the Philadelphia County |
| | : | Court of Common Pleas at No CP- |
| | : | 51-CR-0407441-2004, dated May 5, |
| LAVAR BROWN | : | 2023. |
| | : | |
| | : | ARGUED:  March 5, 2025 |
| PETITION OF: FAMILY MEMBERS OF | : | |
| MURDER VICTIMS MICHAEL | : | |
| RICHARDSON AND ROBERT CRAWFORD | : | |

## DISSENTING OPINION

**JUSTICE WECHT**                                    **DECIDED: June 16, 2026**

In 2024, a majority of Justices chose to invoke this Court's rare and extraordinary King's Bench jurisdiction in order to review the merits of a common pleas court's order. That common pleas decision had vacated Lavar Brown's life sentence and had ordered a new trial on murder and related charges.  Intervening in that trial court process, a majority of Justices decided—*sua sponte*—to use Brown's case to determine "[w]hether, and via what procedure, a common pleas court judge may grant PCRA[1] relief based upon concessions of the parties."[2]  I believe that this Court erred in agreeing to exercise

---

[1]     Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-46.

[2]     *Commonwealth v. Brown*, 32 EM 2023 (Pa. 2024) (*per curiam*).

our King's Bench power here.[3]  And I believe that, with that power now in hand, today's Majority wields it in a manner that leads this Court much more deeply into error.

Instead of confining its review to the case at bar, the Majority takes advantage of the breadth that it perceives in our King's Bench authority in order to scrutinize decisions made by the Philadelphia District Attorney's Office ("DAO") in other, wholly unrelated cases.  Having embarked upon that enterprise, the Majority finds what it believes to be a pattern of purportedly erroneous or unethical concessions by the DAO.  The Majority then attempts to correct the deficiencies it perceives by fashioning an unprecedented and unconstitutional remedy.  The Majority's edict will force common pleas judges in our most populous county to disregard the will of the people's duly elected prosecutor, to gratuitously involve Pennsylvania's Office of the Attorney General ("OAG"), and to encourage the OAG to intervene on behalf of the Commonwealth as a categorical matter in a class of PCRA cases.  This novel procedure is neither mandated nor permitted by statute or rule.  The Majority does not concern itself with the General Assembly's prerogative to enact or amend statutes, nor with this Court's constitutional process of rulemaking.  Rather than referring its concerns to our Rules Committees, and rather than drawing upon the extensive and varied experience that the members of those Committees possess, the Majority eschews our proven processes and instead creates and imposes a

---

[3]     Noting that no Justice dissented from this Court's order granting King's Bench, the Majority criticizes my decision to question the invocation of that power here.  Maj. Op. at 25 n.26.  As the public undoubtedly understands, not every *per curiam* order that this Court issues garners unanimous joinders from all Justices.  More importantly, Justices and readers alike recognize that there are myriad reasons why a Justice might elect not to note his or her dissent on a *per curiam* order, some personal and some institutional, and that declining to note such dissent is a common practice undertaken by every Justice on this Court, both past and present.  The Majority's suggestion to the contrary is misleading, and does not in any event change the fact that exercising King's Bench jurisdiction in this case was a mistake from the start and that the Majority's use of that power here is unprecedented and unconstitutional.

remedy extemporaneously. Ironically, the Majority perceived no urgency in rendering this decision,[4] yet now acts impulsively, circumventing our rulemaking procedures. There is no good reason for this.

The Majority claims that its remedy is necessary to "promote just outcomes."[5] While all aspire to that worthy goal, the manner in which the Majority seeks to effectuate it far exceeds the power and role of the judiciary. If Philadelphians do not approve of the way in which their elected prosecutor is performing his duties, they can replace him. It is not our job to do so.

King's Bench jurisdiction is a sacred power entrusted to this Court. Although the power is "high and transcendent,"[6] it must be wielded with "extreme caution."[7] I regret that today's Majority misuses that power. I must respectfully dissent.

### King's Bench

The Supreme Court of Pennsylvania is at the "apex of the Unified Judicial System."[8] Though our Court sits atop Pennsylvania's judicial branch, its power is not boundless. Like all Pennsylvania courts, we are limited generally to those powers allotted to us by "the Constitution and laws of the Commonwealth."[9] Those powers include the

---

[4] *See id.* at 25 n.26 (noting that it has been two years since this Court agreed to exercise our King's Bench jurisdiction).

[5] *Id.* at 3.

[6] *Commonwealth v. Balph*, 3 A. 220, 230 (Pa. 1886).

[7] *Id.*

[8] *In re Bruno*, 101 A.3d 635, 663 (Pa. 2014); *see* PA. CONST. art. V, § 2 ("The Supreme Court [] shall be the highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth . . . and [] shall have such jurisdiction as shall be provided by law.").

[9] *Bruno*, 101 A.3d at 659; *see also* PA. CONST. art. V, § 2; 42 Pa.C.S. § 502 ("The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania . . . [and] (1) All powers necessary or appropriate in aid of its original and (continued…)

authority to adjudicate disputes and the "general supervisory and administrative authority over all the courts and [magisterial district judges.]"[10]  We also possess "the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722."[11]  This authority to operate as did "the justices of the Court of King's Bench" stands alone among our powers, both in its breadth and in our ability to exercise it unchecked by any other court or branch of government.[12]  For that very reason, "it is a power to be exercised with extreme caution. . . .  That it may be abused is possible."[13]

"By its supreme nature, the inherent adjudicatory, supervisory, and administrative authority of this Court at King's Bench is very high and transcendent."[14]  When our Court invokes this authority, it has not felt constrained by the traditional guardrails of the judicial process.  This Court has espoused the belief that we are not "limited by prescribed forms of procedure or to action upon writs of a particular nature."[15]  Instead, we have "employ[ed] any type of process or procedure necessary for the circumstances."[16]  Nor is

---

appellate jurisdiction which are agreeable to the usages and principles of law [and] (2) The powers vested in it by statute, including the provisions of this title.").

[10]     PA. CONST. art. V, 10.

[11]     42 Pa.C.S. § 502.

[12]     *Bruno*, 101 A.3d at 676 ("As a corollary, the Supreme Court is neither divested of its King's Bench powers, nor is the supreme and general nature of these inherent powers limited, unless the divestiture or limitation is clearly expressed or necessarily implied in the Constitution.").

[13]     *Balph*, 3 A. at 230.

[14]     *Bruno*, 101 A.3d at 669 (internal quotation marks and citations omitted).

[15]     *Id.*

[16]     *Id.*

this Court's King's Bench authority limited by subject matter. King's Bench authority confers "comprehensive jurisdiction over civil and criminal causes, which includes the competence to examine and decide, or to review decisions, relating to the type of causes committed generally or otherwise to an inferior jurisdiction."[17] In fact, our King's Bench jurisdiction is available even when there is "no dispute pending in a lower court."[18]

The unique and astounding breadth and reach of this power can tempt Pennsylvania's Supreme Court to disregard the need for prudence, humility, and restraint that is essential to the proper function, role, and operation of the judiciary. However "high and transcendent" the power may be,[19] it is not "a license to make things up as [we go] along."[20] Today's Majority succumbs to that temptation. The Majority's one-paragraph description of our King's Bench authority acknowledges only one of the well-established limitations upon this power, a power that the Majority otherwise treats as subject to no meaningful constraints.[21] The Majority notes that King's Bench is limited by the duties and powers assigned to the various branches of government by our Constitutions.[22] But, as I explain below, additional limitations exist as well.

---

[17] *Id.* at 670.

[18] *Id.* at 669.

[19] *Balph*, 3 A. at 230.

[20] Benjamin Pontz, *Grounding Pennsylvania's King's Bench Jurisdiction*, 28 U. PENN. J. CONST. L. (forthcoming 2026) (manuscript at 61); *see id.* at 60-61 (explaining that King's Bench jurisdiction derives from the powers granted by the King of England to the Court of King's Bench and that those powers were limited "by law," meaning that the Court of King's Bench was not permitted to "make things up as it went along.").

[21] *See* Maj. Op. at 27-29.

[22] *Id.* at 28. Ironically, as I discuss *infra*, even this acknowledged limitation is disregarded by the Majority in the course of imposing the unwarranted and unconstitutional remedy that it crafts.

Before proceeding further, it is necessary to identify the problem that the Majority believes we need to solve—the cause that warrants the exercise of our King's Bench power. Put simply, the Majority thinks that the DAO too often concedes that criminal defendants are entitled by law to relief in murder cases. In this particular case, Lavar Brown was convicted of second-degree murder and related offenses following the shooting death of Michael Richardson. Brown was sentenced to life in prison without the possibility of parole. After losing on direct appeal, and after unsuccessful post-conviction litigation, Brown filed a second PCRA petition alleging that the DAO had violated its obligations under *Brady v. Maryland*[23] by withholding four documents which demonstrated that one of the Commonwealth's key witnesses, Ronald Vann, had falsely implicated another person in the murder. Brown contended that this evidence constituted impeachment material that he could have used to undermine both Vann's credibility and the police investigation of the murder. Concluding that its predecessors in fact had deprived Brown of critical evidence, the DAO agreed that Brown was entitled to relief as a matter of constitutional law.

Richardson's family members ("Family Members") did not agree with the DAO's decision. They filed a motion to intervene, seeking to have the DAO removed from the case and to provide their own views and arguments to the PCRA court. Given the familiar, settled principle that third parties lack standing in criminal cases,[24] the PCRA court denied the petition.[25] That court did not, however, bar the door to Family Members entirely. The

---

[23]  373 U.S. 83 (1963).

[24]  *See Commonwealth v. Malloy*, 450 A.2d 689, 694 (Pa. Super. 1982) (holding that only the Commonwealth and the defendant are parties to a criminal case and that victims, witnesses, and others thus lack standing).

[25]  The PCRA court granted the petition in part in order to allow Family Members to litigate in support of their position that the DAO had a conflict of interest. The court then denied that claim. In all other respects, the court denied the petition to intervene.

court granted them *amicus curiae* status, and it considered their views and arguments on the merits of Brown's PCRA petition. Family Members did not appeal the denial of their petition to intervene. After multiple rounds of additional briefing, the PCRA court declined to hold an evidentiary hearing, and it ultimately decided to award Brown relief in the form of a new trial.

PCRA petitions are adjudicated in courtrooms across Pennsylvania every day. Most of the time, PCRA courts reach the correct ruling. Occasionally, those courts make mistakes. When a mistake occurs, it is addressed in the ordinary course of appellate review. Those day-to-day decisions are rarely reviewed by this Court, because they are routine, and because they are subject to thorough consideration and error correction by our intermediate appellate court. Until now, PCRA rulings have not supplied warrant for invocation of this Court's King's Bench jurisdiction.[26]

---

[26] The Majority's protestations to the contrary notwithstanding, the legal issue that led to today's opinion is, in fact, average. An incarcerated defendant filed a PCRA petition. The PCRA court granted it without an evidentiary hearing. Whether relief should have been granted, or whether the court should have held a hearing, are routine PCRA issues that our lower courts handle with skill and expertise on a daily basis. The only reason that this case became one that caught this Court's attention is because Family Members were unhappy with the position taken by their elected prosecutor and then failed to avail themselves of the normal procedures available to persons aggrieved by a court's ruling.

The Majority also insists that its treatment of this "matter . . . accords with how we have treated similar matters for decades." Maj. Op. at 25-6 n.26. But, the two examples that the Majority offers are anything but "similar" to the instant case. In *in re Office of Philadelphia District Attorney*, 125 EM 2019, Order, 2/24/2020, we exercised King's Bench to inquire whether the DAO harbored a conflict of interest that prevented that office from litigating that particular case. Our focus was limited to the DAO's involvement in a single case. It was not a sprawling attempt to redefine the roles of the parties in PCRA proceedings in Philadelphia. In *Commonwealth v. Chimenti*, 507 A.2d 79 (Pa. 1986), this Court did not merely grant King's Bench "where the DAO and Chimenti improperly submitted [a] plea agreement to [a] Superior Court judge for approval," which is how the Majority describes it. *See* Maj. Op. at 25-26 n.26. This Court instead granted plenary review in order to determine whether a single Superior Court judge could enter an order compelling a trial court to accept a plea bargain reached by the parties while the case (continued…)

Family Members did nothing to challenge the denial of their request to participate as full parties. Because they wished nonetheless to litigate the merits of Brown's PCRA petition, they sought extraordinary action in this Court instead. Imprudently, this Court relented. Further, upon taking the case, this Court announced, *sua sponte*, that it would consider "[w]hether, and via what procedure, a common pleas judge may grant PCRA relief based upon concessions of the parties?"[27]

Setting aside the fact that there is nothing that would justify treating concessions in PCRA cases differently than we would treat concessions in other areas of the law, we have in any event already answered this question. This is not Brown's only murder case. In 2003, Brown approached a man crossing a Philadelphia street and shot him in the back.[28] Brown was convicted of first-degree murder and sentenced to death.[29] During a subsequent appeal from the denial of PCRA relief, Brown and the DAO filed a joint motion asking this Court to vacate Brown's death sentence and to direct that he be resentenced to life in prison without the possibility of parole. The DAO conceded to this Court that Brown was owed relief. Notwithstanding the parties' agreement, we declined to provide such relief automatically upon the DAO's concession. We rejected outright the argument by both parties that this Court, or any court for that matter, was required to defer to any

---

was pending on appeal. *Chimenti*, 507 A.2d at 80. More importantly, the remedy ordered by the *Chimenti* Court—vacating the single-judge order and remanding the case for a proper appeal—was limited to that which was necessary to resolve the case. *Id.* at 83. We did not impose upon the Superior Court new rules and procedures to ensure that the infraction never again occurred. Neither of the cases held up by the Majority as "similar" exercises of King's Bench jurisdiction actually resembles the broad remedy the Majority fashions here.

[27]    *Commonwealth v. Brown*, 32 EM 2023 (Pa. 2024) (*per curiam*).

[28]    *Commonwealth v. Brown*, 987 A.2d 699, 703 (Pa. 2009).

[29]    *Id.* at 703-05.

prosecutor's discretionary decision to concede a defendant's entitlement to relief. We held instead that a court is empowered to overturn a jury's verdict only when the court reaches the independent legal conclusion that an error has occurred.[30] We explained that an agreement between the parties does not grant this Court authority to undo what the jury determined, absent an independent finding of legal error.[31] Ascertaining whether an error occurred, we emphasized, is a mandatory, exclusive duty that the PCRA assigns to courts, not to the parties.[32] The PCRA allows relief to be granted only when a court "rules in favor of the petitioner,"[33] a circumstance which requires the petitioner to "plead and prove"[34] a substantive claim for relief under the PCRA.[35] A PCRA petitioner must "plead **and prove** [his claim], and this Court must **rule** in his favor."[36] Leaving no doubt as to the legal impact of party concessions in PCRA proceedings, we emphasized that "the PCRA requires **judicial merits review** favorable to the petitioner before any relief may be granted."[37] Thus, we explained, a "confession of error by the Commonwealth does not constitute a judicial ruling" and is "insufficient for any grant of relief under the PCRA."[38]

---

[30] *Commonwealth v. Brown*, 196 A.3d 130, 144 (Pa. 2018).

[31] *Id.*

[32] *Id.*

[33] 42 Pa.C.S. § 9546(a).

[34] *Id.* § 9543(a).

[35] *See id.* § 9543(a)(1) and (2).

[36] *Brown*, 196 A.3d at 144-45 (emphasis in original).

[37] *Id.* at 145 (emphasis in original).

[38] *Id.*

We announced that clear decision in *Brown*. So one would be justified in wondering why this Court agreed to review this issue again. The answer to the question of "[w]hether, and via what procedure, a common pleas judge may grant PCRA relief based upon concessions of the parties" is clear: that answer is "no."[39] *Brown* unambiguously held that a court may grant PCRA relief only when the petitioner has pleaded and proven an entitlement to relief. Party concessions are helpful, and can conserve time and judicial resources by narrowing the range of issues in dispute. But concessions are not a substitute for independent judicial determinations using the applicable legal standards. None of this is new. We stated these principles clearly in Brown's capital PCRA appeal. There is no reason for this Court to invoke our extraordinary King's Bench authority just to repeat ourselves.

But the Majority is onto a different project here. The facade that King's Bench review is necessary here to address this familiar and already-answered legal question crumbles upon even the most cursory reading of the Majority Opinion. The Majority does not substantively address the question presented.[40] Instead, the Majority exhaustively analyzes the merits of the PCRA court's ruling and concludes that the court erred in granting relief. Engaging in this form of error review rarely, if ever, is a reason for us to

---

[39] Concurring in *Brown*, I expressed the view that we should limit our ruling to concessions made to appellate courts in PCRA proceedings, as confessions of error at the court of common pleas level might warrant more lenient treatment. *Id.* at 196 (Wecht, J., concurring). My more limited view did not garner a majority of the votes and, thus, the *Brown* Majority's broader ruling applies to all courts. The Majority nonetheless suggests that my concurrence in *Brown* "clouded the question of whether a Commonwealth concession is sufficient to support a PCRA court's grant of relief." Maj. Op. at 26-27 n.27. Aside from recounting some of my statements from that concurring opinion, the Majority does not explain how such cloudiness resulted, nor can it have done so given that a majority of the Court did not adopt my position.

[40] *See id.* at 26-27 n.27 (resolving the question presented in this case in two lines of a footnote).

grant review, even in our *allocatur* docket. It certainly is no reason to exercise King's Bench jurisdiction.

Even if we suspend sound principles and indulge the fiction that King's Bench review is the appropriate mechanism to address the question at bar, this is not a viable case in which to do so. The PCRA court did not rule for Brown merely because the DAO agreed that it should. The court's order was the product of an extensive, independent legal analysis—precisely as we directed in *Brown*. The PCRA court held status conferences, independently reviewed the parties' stipulations, ordered and considered multiple rounds of briefing, and then rendered a ruling. The court explained:

> [T]he record establishes that the assigned detective in this case learned through investigation that witness, Ronald Vann, had falsely identified Kennisha Paige as being a participant in the January 19, 2023 robbery and murder here at issue, and that this false identification was not disclosed to the defense; that a critical witness had made a demonstrably false identification of someone as being a participant in the same criminal events that are the subject of the charges against Mr. Brown was, in my view, impeachment evidence of a different character than the impeachment material used at trial and I find that the suppressed evidence satisfies the standard for materiality under *Brady* and its progeny.[41]

The PCRA court insisted that it was "going to treat this case like every other case," and it vowed to "just follow the rules and attempt to treat it like every other PCRA."[42] The court stressed that the lack of adversarial litigation did not influence its decision. The court stated that it "did what [it] thought was right."[43] Apparently, the DAO's concession was not a dispositive factor in the PCRA court's decision. To the extent that it is ever wise to wield this Court's King's Bench authority to review the propriety of relying

---

[41]   Notes of Testimony ("N.T."), 5/5/2023, at 4.

[42]   N.T., 10/07/2022, at 10.

[43]   *Id.* at 10-11.

substantively upon a party's concession, we should, at the very least, await a case in which that reliance actually happened.

That this Court has chosen here to exercise our highest power in order to review a PCRA order for error is far from the only problem in this case. As noted earlier, despite the wide latitude that accompanies King's Bench jurisdiction, there are substantive limits upon its initial invocation. We have warned that this unchecked power must be "exercised with extreme caution" and is appropriate only "to avoid the deleterious effects arising from delays incident to the ordinary process of law,"[44] and only when "the issue requires timely intervention by the court of last resort of the Commonwealth and is one of public importance."[45]

The Majority's displeasure with the DAO's concessions, in this case and in others, does not implicate any larger public concerns that warrant displacement of traditional judicial practices and procedures. Let us speak plainly. This case is about the actions of one elected District Attorney, in one subset of cases, in one county. There is no reason (nor any evidence) to believe that the Majority's distress over the number of prosecutorial concessions concerns a problem occurring in any other county in Pennsylvania, or that there is any risk that this will become a problem elsewhere. There is no evidence that our lower courts are failing to manage the Majority's concerns. As discussed below, the evidence demonstrates just the opposite. Furthermore, the Majority's actions will have no statewide application or precedential value. The Majority candidly admits that its decision applies only to one small portion of the cases in Philadelphia, and it fashions a

---

[44]    *Commonwealth v. Williams*, 129 A.3d 1199, 1206 (Pa. 2015).

[45]    *Bruno*, 101 A.3d at 670; *See also In re President Judge for 30th Judicial Dist.*, 216 A.2d 326, 326 (Pa. 1966) (granting King's Bench due to the "time element and the importance of the issues involved"); *accord In re Smith's Estate*, 275 A.2d 323, 326 (Pa. 1971) (concluding that the Court did not have jurisdiction to rule on an interlocutory appeal, noting that the case lacked "exceptional circumstances").

remedy that applies only to the limited circumstances that may, or may not, occur again in Philadelphia.[46] The narrow ambit of this case does not implicate larger public concerns, whether now or in the future.

The fact that a majority of Justices of this Court apparently wants to correct what it believes to be erroneous discretionary decisions by one prosecutor's office is not a circumstance that requires this Court's immediate and extraordinary action. This case never required this Court's "timely intervention," an essential component in the King's Bench calculus.[47] It has been almost three years since Family Members filed their petition for King's Bench jurisdiction with this Court.[48] There was no need for imminent action. Had this Court not intervened, the only consequence would have been that a common pleas judge would have proceeded with Brown's retrial. To the extent that this consequence can be considered prejudice, it was not irreparable. It only became so because Family Members chose not to pursue an earlier appeal of the denial of their intervention request. Their failure to preserve and protect their rights is not a justification for this Court to invoke the power of King's Bench.

This observation reveals another transgression here of the limitations on King's Bench jurisdiction. It is well-established that King's Bench authority cannot be invoked to "permit or encourage parties to bypass an existing constitutional or statutory adjudicative process and have a matter decided by this Court."[49] King's Bench jurisdiction is not a

---

[46] *See* Maj. Op. at 95.

[47] *See Bruno*, 101 A.3d at 670.

[48] Family Members' "Petition for Exercise of King's Bench Jurisdiction" was filed on May 26, 2023.

[49] *Bruno*, 101 A.3d at 670. The Majority refuses to apply this limitation. While insisting otherwise, the Majority improperly provides Family Members a second opportunity to advance their claims against the DAO and to relitigate the merits of Brown's PCRA petition. *See* Maj. Op. at 28 n.28. The Majority justifies or rationalizes its (continued…)

mechanism to revive forfeited rights. Yet, the Majority allows Family Members to do just that. Those individuals sought intervention before the PCRA court. That court denied their request. Family Members could have appealed that ruling to the Superior Court, requesting an expansion of third-party rights in that case or in criminal cases generally, or arguing that the DAO's concession altered the landscape of the collateral proceedings such that they should have been permitted to challenge the PCRA court's ruling. Family Members chose not to do so. Only after the PCRA court granted Brown's PCRA petition did Family Members seek this Court's intervention. They were too late. And they were in any event barking up the wrong tree.

The Majority proclaims that it cannot "ignore the reality that the PCRA court's erroneous grant of relief in this case was abetted by the DAO's lack of candor and failure to conduct a reasonable investigation."[50] The Majority identifies what it believes to be a

---

invocation of King's Bench jurisdiction by glancing down at the proceedings below and finding no "case at all." *Id.* What the Majority consistently fails to acknowledge is that the reason that there is no case pending below is because Family Members chose to end their litigation there. Nothing prevented Family Members from appealing the denial of their petition to intervene. The Majority excuses Family Members' failure to appeal the adverse ruling because "the right to intervene never existed in the first place." *Id.* at 28 n.28. That is ironic, because the absence of that right did not stop Family Members from filing a petition to intervene "in the first place." *Id.* And, more importantly, the fact that the law does not permit such intervention should give this Court pause before it allows the remedy the Majority imposes here. That success on appeal may have been difficult— insofar as Family Members would have had to argue for an expansion of the law—does not mean that they were prohibited from pursuing that avenue for relief. Good faith arguments to change the law are hardly rare in this Court. Rather than holding Family Members to the same prerequisites as any other party, today's Majority instead swoops in and rewards them for their failure to avail themselves of the avenues for advancing their claims that were available below. *In re Bruno*, the case upon which the Majority relies as support for its unwarranted intrusion into this matter, *see* Maj. Op. at 28 n.28, states unequivocally that rescuing parties from their own decisions is not a proper use of King's Bench. *Bruno*, 101 A.3d at 670 (King's Bench should not be used in a manner that would "permit or encourage parties to bypass an existing constitutional or statutory adjudicative process and have a matter decided by this Court").

[50] Maj. Op. at 58.

litany of ethical violations committed by the DAO throughout the history of this case.[51]
The Majority does not explain how a discussion of those purported violations falls within
the appropriate limits of our King's Bench power. It bears repeating that King's Bench
cannot be invoked merely as an alternative to existing and available processes and
procedures.[52] All Pennsylvania lawyers must abide by our Rules of Professional Conduct.
Any violations of those rules must be alleged first in a complaint to the Office of
Disciplinary Counsel. These are adjudicated before the Court's Disciplinary Board, and
this Court thereafter renders a final decision. In the face of this, the Majority nonetheless
bypasses established procedures and publicly declares the DAO guilty of various ethical
violations *sua sponte*—without hearings, counsel, briefing, or any other procedural
protections. This endeavor far exceeds the intentions and boundaries of our King's Bench
power.[53]

---

[51] *See id.* at 58-69.

[52] The Majority misreads this point. *See id.* at 28 n.28. It is not the fact that there is no live appeal, or that Family Members lack standing, that precludes our invocation of King's Bench, although both are true. It is that King's Bench cannot be used as a mechanism to revive forfeited rights or to circumvent already existing procedures. This is a substantial limitation upon this Court's vast power that the Majority ignores repeatedly. The King's Bench power was never meant to be a life vest that we toss to a party that could have pursued relief in the normal course but failed to do so.

[53] For the Majority, this is a "novel argument." *Id.* at 58 n.43. However, there is nothing new or novel about the principle that King's Bench is not a substitute for litigating claims within the existing framework for such claims, assuming there is no emergency or exigency that would preclude such review. It is only novel in the Majority's eyes because the Majority refuses to recognize it as a limitation on what the Majority instead believes to be an unlimited power. If the DAO or its members have committed ethical violations, those transgressions should be litigated before the Disciplinary Board, not here on King's Bench review.

As noted, *supra* at n.27, the Majority offers a "litany" of cases that it contends provides adequate justification for its actions. These citations do not stand up to even minimal scrutiny. *See* Maj. Op. at 58 n.43. None of the cases cited by the Majority allows for the *sua sponte* adjudication of ethical violations by the DAO. First, in both *County of Fulton v. Secretary of Commonwealth*, 292 A.3d 974, 1018 (Pa. 2023), and (continued…)

**The Remedy**

Not content merely to overturn the PCRA court's order in this case, the Majority then turns its attention to other cases in which the DAO has conceded some form of relief. Unsurprisingly, the Majority finds the troubling pattern for which it went searching. To combat this perceived problem, the Majority mandates that, going forward, any time the DAO attempts to concede relief, a PCRA court must provide notice to the OAG and afford it the opportunity to intervene and represent the Commonwealth alongside the DAO.[54]

Taking the OAG's word for it,[55] the Majority explains that the DAO has conceded relief in at least one hundred and twenty cases, most of which are murder prosecutions.[56] We do not have certified records for any of those cases. This Court did not, and could

---

*Commonwealth v. Vandivner*, 983 A.2d 1199, 1202-03 (Pa. 2009), this Court addressed an attorney's conduct before this Court. Here, by contrast, the purported ethical violations occurred below, and we lack any record, briefing, or argument on these issues. None of the cases cited by the Majority suggests that we may discern ethical violations from our reading of the proceedings below and conclusively rule upon such violations without at the very least an evidentiary record. Similarly, *Commonwealth v. D'Amato*, 526 A.2d 300, 314 (Pa. 1987), and *Commonwealth v. Stoyko*, 475 A.2d 714, 724 n.7 (Pa. 1984), both suggest that, when such ethical violations are transparent on the record before us, the proper course of action is to refer those matters to our disciplinary board for fair and adversarial proceedings. None of the cases cited by the Majority stands for the proposition that this Court can deem an entire office to have violated numerous ethical rules—again, without briefing, argument, evidentiary development, or procedural protections—and then use those *sua sponte* rulings to justify a sweeping new remedy that reorients how a statutory scheme operates.

54     Maj. Op. at 95.

55     The Majority remarks that the DAO does not disagree with this number. *Id.* at 69-70 n.50. That does not alter the fact that the Majority does not independently verify the accuracy of this number of cases. The Majority also declines to identify the number of cases in which the DAO has not conceded relief or the ratio in which the DAO concedes relative to the total number of cases it litigates. We are just meant to accept the Majority's belief that the number alone constitutes proof that the DAO has abdicated its duty to the point that this Court must intervene and bypass our normal rule-making process in order to create rules that apply only to the DAO.

56     *Id.* at 69 (citing OAG's Brief at 5-30; OAG's Reply Brief at 10 n.3).

not, review any of the trial and hearing transcripts generated in those cases. This Court did not, and could not, evaluate any of the motions, briefs, and arguments made by parties in those cases, nor examine the propriety of those concessions. We do not even know why the DAO conceded relief in those cases or whether the courts granted such relief. Regardless, to the Majority, these concessions must all have been erroneous or predicated upon some improper motive.[57] For the Majority, the facts and circumstances of these cases are of no concern. It is the number alone that draws the Majority's ire.

In some of those cases, the Majority laments, the DAO conceded relief notwithstanding its belief that the defendant was guilty. The Majority apparently conceives the prosecutorial role to be a duty to defend a conviction against any legal challenge, regardless of merit, unless there is clear evidence of actual innocence. But even the most guilty defendant is entitled to a fair trial, or a retrial, if the first one is tainted by error or constitutional violation. The Majority would have prosecutors—officers of the court who are sworn to refrain from making frivolous arguments—automatically oppose any form of relief, so long as that prosecutor believes the defendant to be guilty. At this late date, it should (but apparently does not) go without saying that a prosecutor's role in our criminal justice system is not so narrow. The prosecutor must pursue truth and justice, obey his or her oath to our Constitutions and laws, adhere to rules of professional conduct, and ethically review and litigate criminal cases, even those that involve clearly guilty defendants. To carry out these functions, a prosecutor must be independent and free to make decisions without reprimand. A prosecutor should not be coerced by this Court, or

---

[57] The Majority concedes that what underlies its heavy-handed approach in this case is its belief that the DAO's concessions are predicated upon improper motivations. *See id.* at 71 n.53 (suggesting that the DAO's concessions "have been motivated by a policy-based opposition to the severe penalties imposed rather than legal considerations."). Aside from this Court's bird's eye view from afar, there is no record-based evidence to support this assertion.

any court, into staunchly opposing relief when the law says that relief is due, no matter how criminally culpable a defendant may appear.[58]

The Majority is especially troubled that the DAO has conceded relief in capital cases. This, according to the Majority, is a problem because "[m]ost of the DAO's concessions have led to convictions being overturned."[59] A statement of this nature coming from this Court is disconcerting, to say the least; it conveys the impression that this Court perceives our criminal justice system to be functioning improperly when convictions are overturned. Undeterred by this appearance of partiality, and without reviewing evidentiary records, trial court opinions, or any other materials from these cases, the Majority assumes that the convictions were overturned in error. It is unfathomable to the Majority that those convictions were overturned because the courts were convinced that relief was required by law. The fact that relief was awarded after a DAO concession suffices to convince the Majority that the DAO abdicated its duty in every one of these cases.

The data paint a different picture, one that does not warrant the extreme remedy imposed by the Majority in this case. Those data suggest that our lower courts are more than capable of sifting through the DAO's many concessions and awarding relief when

---

[58]     *See generally Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that, because a prosecutor must respect the rights of the defendant and enforce the interests of the public, the prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer"); *Commonwealth v. Clancy*, 192 A.3d 44, 52 (Pa. 2018) (noting that, as an officer of the court, the prosecutor has the responsibility to serve the public interest and to "seek justice within the bounds of the law, not merely to convict") (quoting *Commonwealth v. Starks*, 387 A.2d 829, 831 (Pa. 1978)); *see also* Robert H. Jackson, *The Federal Prosecutor*, 31 AM. INST. CRIM. L. & CRIMINOLOGY 3, 3 (1940) (observing that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous").

[59]     Maj. Op. at 71.

appropriate. There is no evidence to suggest that those courts are indiscriminately granting relief any time the DAO agrees to it. That certainly is not what the PCRA court did in the case at bar. Nor is there any reason to believe that those courts need us to micromanage them. That many of the "DAO's concessions have led to convictions being overturned"[60] does not suggest that the lower courts will not be able to continue their work without our heavy-handed intervention. It actually suggests that, because the courts in those cases found that those defendants were, by law, entitled to relief, the DAO was right to concede. The fact that relief has not been granted in every case in which the DAO concedes is further evidence that those courts are reviewing both the claims for relief and the DAO's concessions thoughtfully and independently, just as this Court envisioned in *Brown*.

In an attempt to justify its remedy, the Majority lists eleven cases in which the DAO "conceded relief where none was warranted and engaged in other unreliable conduct."[61] That list, however, does not show the "gravity and extent of the problem," as the Majority claims.[62] Instead, it shows that both Pennsylvania courts and federal courts have proven more than capable of sorting through the DAO's concessions, denying relief when those concessions are inconsistent with the facts of a case or the applicable law, and imposing sanctions when the DAO's actions or concessions warrant. The Majority has proven that, in nearly every instance, regardless of whether the PCRA judge granted or denied relief, our courts are independently examining the DAO's advocacy and taking appropriate action.

---

[60] *Id.*

[61] *Id.* at 72.

[62] *Id.*

The fact that "in at least ten cases the DAO has been held by state and federal courts to have wrongly conceded relief where none was warranted under the law"[63] amply demonstrates that our criminal justice system is operating exactly as it should (at least in this regard) and requires no intervention or recalibration.[64] That our courts recognize errors and then remedy them is cause for commendation, not for heavy-handed fixes. The Majority steps in nonetheless, imposing upon Philadelphia and Pennsylvania an unprecedented and unjustifiable remedy—one that encroaches upon the rights, duties, and powers of another branch of our government.

In applying the Majority's remedy, PCRA courts have no discretion or flexibility.[65] That remedy is an immutable command from this Court. Nor does the new rule merely invite the OAG to participate in an advisory role. When the DAO concedes relief, the OAG is given full party status. Whatever the DAO can do, the OAG can do. This is no mere procedural rule. Given that the DAO is elected by the citizens of Philadelphia to serve as their voice in these matters, the OAG's intervention will have a substantive impact on the DAO's prescribed role in these cases. The Philadelphia electorate no longer will be represented solely by the representative that it chose.

---

[63] *Id.* at 88.

[64] The Majority does not perceive from these illustrations evidence that our lower courts are skilled and effective at discovering prosecutorial improprieties. Instead, the Majority sees inability and impotence. *Id.* at 89 n.64. This, the Majority asserts, is because courts are limited to the arguments and representations of the parties and to the certified record before the court. The Majority insists that courts cannot overcome these hindrances and that it would be unreasonable to expect them to do so. The ten cases cited by the Majority, cases in which courts did precisely what the Majority proclaims they are incapable of doing, offer compelling evidence that the Majority's lack of faith in our courts is unwarranted.

[65] *Id.* at 95 ("[W]e now hold that in any PCRA case in which the DAO concedes relief, the PCRA court, before ruling on the concession, *shall* afford the OAG notice and an opportunity to intervene") (emphasis added).

The Majority claims that this new procedure falls within the parameters of this Court's King's Bench jurisdiction and within this Court's constitutional supervisory powers. It does not. This extreme remedy encroaches upon the executive branch's discretionary decision-making authority and upon the lawmaking function of the legislative branch. Both of these encroachments violate the separation of powers, which is the one limitation upon King's Bench jurisdiction that even the Majority recognizes.[66]

The Pennsylvania Constitution "vests legislative power in the General Assembly; executive power in the Executive Department consisting, *inter alia*, of the Governor, the Attorney General, and various administrative agencies, as provided by law; and judicial power in a unified judicial system and, ultimately, in the Supreme Court."[67] The legislative branch writes the laws. The executive branch executes them. The judicial branch interprets and applies them.[68] Today's Majority presumes to override these familiar and foundational distinctions, arrogating to itself a breathtaking compendium of powers.

The separation of powers doctrine ensures that no one branch encroaches upon the constitutional authorities and obligations of the other. In this Commonwealth, "the roots of the . . . doctrine run deep."[69] A corollary to our constitutional system of checks

---

[66] *See id.* at 28 ("The only limits on the Court's maximal powers at King's Bench are those set forth in the Pennsylvania and United States Constitutions.") (citation omitted).

[67] *Robinson Twp., Washington Cnty. v. Com.*, 83 A.3d 901, 991 (Pa. 2013); *see also* PA. CONST. art. II, § 1; art. IV, § 1; art. V, § 1.

[68] *See Robinson Twp.*, 83 A.3d at 991 (citations omitted); *see also* PA. CONST. art. IV, § 2.

[69] *Renner v. Ct. of Common Pleas of Lehigh Cnty.*, 234 A.3d 411, 420 (Pa. 2020).

and balances,[70] this principle is "[o]ne of the distinct and enduring qualities of our system of government."[71] It has been enshrined in our Constitution since its very first draft.[72]

> This separation depends on two distinct concepts, as embraced by the framers of both the [F]ederal and Pennsylvania [C]onstitutions: (1) no branch may usurp a function belonging to another and each must operate within its own separate sphere of power; and (2) a system of checks and balances exists, which prevents one branch from acting unchecked.[73]

This fundamental tenet "prevents one branch of government from exercising, infringing upon, or usurping the powers of the other two branches,"[74] ensuring that no one branch of government accumulates too much power, thus preserving and protecting the existence and functioning of the other two.[75] In order to "'avert the danger inherent in the concentration of power in any single branch or body,' no branch may exercise the functions delegated to another branch."[76]

The Majority suggests that authority for its remedy may be found in this Court's constitutional power to prescribe rules "governing practice, procedure and the conduct of all courts."[77] To be sure, this Court possesses broad and exclusive authority over the "practice, procedure, and the conduct of all courts," such that no other branch of

---

[70] *Id.*

[71] *Commonwealth v. Mockaitis*, 834 A.2d 488, 499 (Pa. 2003).

[72] *Jubelirer v. Rendell*, 953 A.2d 514, 529 (Pa. 2008).

[73] *Jefferson Cnty. Ct. Appointed Emps. Ass'n v. Pennsylvania Lab. Rels. Bd.*, 985 A.2d 697, 706 (Pa. 2009) (citations omitted).

[74] *Renner*, 234 A.3d at 419.

[75] *Id.* at 419-20 (citing *Jefferson County*, 985 A.2d at 706-07).

[76] *Id.* at 419 (quoting *Jefferson County*, 985 A.2d at 706-07).

[77] *See* Maj. Op. at 93-94 (quoting PA. CONST. art. V, § 10(c)).

government constitutionally may act in this arena.[78] This broad power is not limited to promulgating procedural rules governing hearings and trials; it extends to lawyers, court personnel, and other judicial employees. It includes the authority to manage judicial personnel and to supervise attorneys who appear in our courts. "[T]he judiciary's authority over court personnel 'is essential to the maintenance of an independent judiciary.'"[79] The exercise of these and other inherent powers is essential in order to "preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed."[80]

But the remedy crafted by the Majority is no mere regulation of lawyers who appear in one of our courts. Under the broad umbrella of these powers, the Majority effectively amends existing legislation in order to coerce our PCRA courts into implementation of a procedure that requires them to notify and invite the OAG to perform what is undoubtedly a discretionary act: intervention in a post-conviction, collateral proceeding in a single county. The authority that the Majority wields to manufacture this remedy, like all powers, "is not unlimited."[81] To the contrary, in order for our system of checks and balances to endure, "each branch must be kept from controlling or coercing the other."[82]

---

[78] *Pennsylvania State Ass'n of Jury Comm'rs v. Commonwealth*, 78 A.3d 1020, 1032 (Pa. 2013) (recognizing this Court's authority over our lower courts and reiterating that "neither the legislative branch nor the executive branch of government may constitutionally infringe on this judicial prerogative").

[79] *Jefferson County*, 985 A.2d at 707 (quoting *County of Lehigh v. PLRB*, 489 A.2d 1325, 1327 (Pa. 1985)).

[80] *Com. ex rel. Carroll v. Tate*, 274 A.2d 193, 197 (Pa. 1971).

[81] *Jefferson County*, 985 A.2d at 707 (citation omitted).

[82] *Renner*, 234 A.3d at 420; *see also Mockaitis*, 834 A.2d at 500 (explaining that one branch of government "cannot constitutionally impose upon [another] branch powers and obligations exclusively reserved to [another] branch; nor can it in essence deputize [another branch's] employees to perform duties more properly reserved to another of the co-equal branches of government.").

Lawrence Krasner, Esquire, is the elected District Attorney in Philadelphia. The people of Philadelphia have repeatedly elected him to exercise his discretion on behalf of the Commonwealth in Philadelphia's criminal cases. The Majority (and I) may disagree with how District Attorney Krasner chooses to exercise that discretion. But that is of no moment. Such disagreement does not authorize us to displace Mr. Krasner when the voters have not chosen to do so. By compelling courts to induce the OAG's participation, the Majority elects to impose upon District Attorney Krasner a babysitter, the OAG, upon whom it bestows full party status. The Majority's novel remedy is a clear violation of the separation of powers. *Sua sponte* and by fiat, the Majority enables an executive branch entity to serve alongside another duly elected executive branch entity in circumstances not contemplated or authorized by the Commonwealth Attorneys Act ("the CAA").[83] To make this happen, today's Majority writes a provision into the CAA that the legislative branch did not see fit to include. The Majority's judicial legislation is all in service of an extraordinary effort to override the discretion of one executive branch entity, the DAO.[84]

The Majority's notice procedure cannot be found anywhere within the statute that authorizes the OAG's participation in criminal or civil cases. To the contrary, the remedy

---

[83]     71 P.S. § 732-101.

[84]     The Majority protests that allowing the OAG to intervene in Philadelphia PCRA cases has no impact upon the DAO's discretion in those cases. Maj. Op. at 107. This is manifestly incorrect. In every county, the elected District Attorney and his or her representatives have the discretion to decide how to litigate criminal cases, including post-conviction proceedings. This discretion includes decisions to terminate a prosecution or to concede relief. When the Majority requires a trial court to consider alternative suggestions by outside parties, it unlawfully intrudes upon the District Attorney's province to exercise prosecutorial discretion. It is improper for this Court to force a PCRA judge to consider an alternative perspective merely because today's Majority does not agree with the way in which Philadelphia's elected District Attorney has prosecuted cases in the past. This undermines and effectively sidelines the lawful prerogatives of the prosecutor chosen by the Philadelphia electorate to exercise discretion in the manner approved of by that electorate.

conflicts with critical portions of that statute. The CAA, a comprehensive statutory scheme enacted by our General Assembly, governs the OAG's ability to participate in legal matters. In criminal matters, for example, the CAA states that the OAG "shall" have the power to participate in cases in which criminal charges are filed against state officials or corrupt organizations, or in cases referred by a state agency arising out of that agency's enforcement provisions, or in which a county district attorney or president judge *requests* the OAG's assistance.[85] The CAA contains no provision that permits what today's Majority commands. Nothing in the criminal case provisions of the CAA requires, or even allows, a PCRA court to notify the OAG and then to permit the OAG to intervene and serve as a full party alongside an elected district attorney in routine PCRA litigation. By the CAA's plain and unambiguous statutory terms, only an elected district attorney or a president judge can make such a request.

In civil cases, the OAG generally is required to "represent the Commonwealth and all Commonwealth agencies, and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies."[86] As far as civil cases go, that is all the OAG is statutorily required to do. Thus, to the extent that the PCRA is civil in nature,[87] the OAG has no obligation to participate in such proceedings. The CAA does endow the OAG with some discretion to intervene in civil cases. Indeed, the OAG "may intervene in any other" civil action.[88] But, as in the CAA's criminal provisions, there exists in the CAA no statutory obligation requiring courts to provide notice to the OAG when a prosecutor makes a

---

[85] 71 P.S. § 732-205(a)(1)-(3), (5), (6) (emphasis added).

[86] *Id.* § 732-204(c).

[87] *See Commonwealth v. Haag*, 809 A.2d 271, 284 (Pa. 2002); *Commonwealth v. Hill*, 16 A.3d 484, 495 n.14 (Pa. 2011).

[88] 71 P.S. § 732-204(c).

concession and further requiring them to invite the OAG to exercise its civil case discretion. Statutory modification is a job for the General Assembly, not this Court. The Majority protests that it is not revising the statute, but is merely "lawfully effectuating the discretionary will of the OAG."[89] Not so; the CAA already provided and defined the OAG's discretion to intervene in civil cases.[90] There is no need for this Court to "effectuate" the discretion that the OAG already has, and that the OAG can "effectuate" on its own.

The Majority disavows responsibility for its far-reaching actions, claiming instead that it is simply acceding to the OAG's request.[91] Presumably, we are to believe that the question of how the remedy came to the Majority's attention is irrelevant. Having solicited this remedy,[92] the Majority now has adopted it. And it then imposes that remedy upon our common pleas courts. Moreover, even regardless of who came up with the idea, it remains a mechanism that this Court is unauthorized to add to the CAA from the bench.

The Majority insists nonetheless that it merely is acceding to the OAG's request. The Majority tells us that, if the OAG desires to decline this intervention authority, the OAG may simply return to this Court and request that the notice protocol be terminated. This begs the question: is this Court creating a new constitutional procedural rule, as the Majority claims, or is the Court merely granting temporary intervenor status to the OAG? Or is it doing both? It is exceptional, to say the least, for this Court to create in a judicial

---

[89] Maj. Op. at 107.

[90] 71 P.S. § 732-204(c).

[91] Maj. Op. at 106-07 (claiming that this Court is not "coercing" the OAG "against its wishes" to participate in PCRA proceedings through its notice remedy.) *Id.* at 107. The Majority asserts that it has not thrust this remedy upon the OAG, noting that the OAG "has, of its own volition, requested this Court craft a mechanism whereby it be notified and given an opportunity to intervene in the DAO's concession cases." *Id.*

[92] *See* Order, 4/3/2024 (*per curiam*) (inviting the OAG to file a brief and present oral argument).

opinion a new constitutional rule of procedure that only applies in one circumstance, in one county, and then to announce that the rule exists for only as long as the OAG wants it to exist.

The Majority insists that the right which it recognizes today—"the right to intervene"[93]—is procedural, not substantive, and one that this Court is empowered to invent under our constitutional rulemaking authority. That is incorrect. In fact, the Majority itself explains why the right it manufactures today breaks new ground: it emphasizes that the OAG will now "become an additional, full party in the case."[94] The Majority's restructuring invites and encourages the OAG to intervene in an entire class of cases in which the General Assembly has not assigned it a role. When the OAG invokes this new, judicially-invented authority, it will gain the ability to file pleadings, request discovery, participate in hearings, present evidence, and make substantive arguments.[95] In other words, the OAG will be able to engage in the same substantive actions as the DAO or the PCRA petitioner. If the primary parties' role is substantive in nature, then so too is the OAG's. The Majority's attempt to reframe the "right to intervene" as merely procedural is unconvincing.

### Justice McCaffery's Concurring Opinion

My esteemed colleague Justice McCaffery endorses the Majority's exercise of King's Bench jurisdiction as a corrective measure against the DAO's alleged indiscretions and misconduct. But Justice McCaffery would go even further than the Majority. Without

---

[93]     *Id.* at 97-98.

[94]     *Id.* at 95.

[95]     *Id.* at 95 n.69 ("The OAG can request discovery and evidentiary hearings pursuant to the existing rules governing these procedures. *See* Pa.R.Crim.P. 902(E), 907, 908, and 909(B). As a full party, the OAG may appeal the PCRA court's decision as of right. *See* Pa.R.A.P. 501; [*In re Barnes Found.*, 871 A.2d 792, 794 (Pa. 2005)].").

input from our Rules Committees or legislative authorization, Justice McCaffery would wield this Court's power so broadly as to mandate a reconstruction of the relationships and responsibilities of District Attorneys and the OAG. Such an imposition of judicial will would be manifestly improper and beyond any lawful bounds. Justice McCaffery believes that every *Brady* claim requires a District Attorney to step aside and allow an OAG takeover, regardless of whether such claim is made before or after trial, on appeal, or during post-conviction proceedings.[96] Justice McCaffery maintains that it is the OAG, not the District Attorney, that must represent the Commonwealth in all PCRA proceedings.[97] Neither the United States Supreme Court nor this Court has ever seen fit to disqualify prosecutors from responding to *Brady* claims at any point in time since the *Brady* ruling was announced in 1963.[98] And no court has ever held that only the OAG must represent

---

[96] *See* Conc. Op. (McCaffery, J.) at 2.

[97] *Id.*

[98] Since 1963, countless *Brady* claims have been raised and litigated in our courts. Routinely, a criminal defendant will allege that a prosecutor or police officer failed to disclose *Brady* material, whether intentionally or otherwise. Often, such claims are resolved by the prosecutor's demonstration through records, emails, photocopies, or letters that such material had been turned over. On other occasions, the prosecutor must explain why such materials were not provided to the defense. Justice McCaffery would upend over six decades of practice by mandating that, every time a defendant raises a *Brady* claim, a conflict of interest automatically arises such that the OAG must be substituted for the elected District Attorney. Justice McCaffery would deny the DA the opportunity to defend himself and would instead sideline the DA and add to the growing (and likely unmanageable) burden that this Court is placing upon the OAG.

To repeat, in the sixty-three years that have elapsed since *Brady*, neither the United States Supreme Court nor this Court has ever required such an extreme remedy. That is not an interpretation of a statute, rule, or constitutional provision. It is certainly not "a new canon of construction" that rests "on the laurels of tradition as [the] interpretive polestar." *Id.* at 18-19 n.18. It is a recognition of the striking novelty of Justice McCaffery's position. Of the thousands of Justices and Judges that have addressed *Brady* claims over the decades (including those serving on the Court that decided *Brady*), I am not aware of even one that has ever seen what Justice McCaffery now tells us is as plain as day.

(continued…)

the Commonwealth in PCRA litigation since the General Assembly passed the PCRA in 1995. No drastic rearrangement should be mandated *sua sponte* by judicial fiat now. A change of such magnitude (even if it was advisable) should be made only with (and after) deliberation, consultation with our Rules Committees, deference to legislative authority, and input from the public and interested parties.

Justice McCaffery proposes a staggering new conception[99] of this Court's role in PCRA appeals. Notwithstanding that this Court has always treated these matters on a discretionary basis, Justice McCaffery now envisions a mandatory and far more active role, one that would require this Court to intervene—apparently under an ongoing exercise of King's Bench jurisdiction—in all cases in which a prosecutor fails or declines to appeal a grant of PCRA relief.[100] Setting aside that this Court lacks the resources to babysit PCRA litigation in Pennsylvania's sixty-seven counties, this, too, is an improper use of King's Bench jurisdiction. Justice McCaffery suggests that this intervention is necessary because a PCRA petitioner might obtain relief in a circumstance where PCRA

---

Justice McCaffery's assertions notwithstanding, I attempt no reinterpretation or addition to the language of Rule 1.7 of Pennsylvania's Rules of Professional Conduct. The rule is plain and unambiguous. *See* Pa.R.P.C. 1.7(a) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest."). What is ambiguous and uncertain is Justice McCaffery's assumption that every *Brady* claim automatically constitutes a conflict of interest requiring immediate replacement of the elected prosecutor. Neither the United States Supreme Court nor this Court has ever stated what Justice McCaffery believes is the law. Justice McCaffery assumes a component of Rule 1.7 that has yet to be established.

[99] Justice McCaffery's "analysis and suggestions" include disqualifying prosecutors automatically from litigating *Brady* claims, mandating that the OAG, and not District Attorneys, defend judgments of sentence in post-conviction collateral proceedings, and converting neutral PCRA courts into interested parties. *See id.* at 4 n.4. To my knowledge, none of these "suggestions" has ever before been proposed, much less implemented, in Pennsylvania. Justice McCaffery's protests notwithstanding, it is fitting and accurate to characterize these "suggestions" as both staggering and new.

[100] *Id.* at 5.

jurisdiction had not first been established. Such a thing could happen. If it did, it would be one more consequence (among many) of an inherently imperfect system. While our judicial system strives in every case to fairly and correctly administer justice, courts at times can (and do) get things wrong. That some small percentage of cases may slip through the jurisdictional cracks is no warrant for sweeping intervention by this Court.

It is true that retrials do not always yield guilty verdicts. It also is true that, sometimes, no retrial will occur. No legal system is infallible. Disappointment is one of many byproducts of the discretion that elected prosecutors are afforded in ours. Sometimes, the guilty go free. Sometimes, constitutional violations prevent the guilty from facing trial. Justice does not always prevail. These consequences are unfortunate. They are a tax we pay for the least-worst system whose fruits we enjoy. That these deficiencies are possible does not merit "close review" by this Court. Any irregularities apparent in the case at bar are insufficient to warrant this Court's intervention, let alone the unprecedented heavy hand that Justice McCaffery would bring to bear.

Justice McCaffery maintains that the grant of a new trial in a non-adversarial proceeding is "extraordinary," so much so that the "integrity of the criminal justice system" is "immeasurabl[y]" impacted.[101] Justice McCaffery asserts that such rulings create lasting and "notable damage" to the "public's confidence in a fair and impartial legal system."[102] As I have stated elsewhere, it is beyond cavil that cases are best resolved through the adversarial process.[103] That does not mean that party concessions are inherently wrong or undesirable. To the contrary, the functioning of our legal system relies

---

[101]    *Id.* at 6.

[102]    *Id.*

[103]    *See Quigley v. Unemp. Comp. Bd. of Review*, 263 A.3d 574, 601 (Pa. 2021) (Wecht, J., concurring).

upon agreements and concessions between adverse parties. Guilty pleas, civil settlements, and stipulations ensure that our system operates fairly and efficiently. Parties should not be deterred from or penalized for agreeing that relief is due in some appropriate circumstance.

Justice McCaffery's view that public confidence in the judicial system suffers irreparable damage when a prosecutor concedes relief is a view that assumes the concession must be erroneous or must be offered for improper reasons. It is just as likely, and surely more likely, that public confidence in our legal system is bolstered when a prosecutor who discovers an error in a prior prosecution agrees that correction of that error is necessary in order to ensure that the defendant receives the fair trial to which he is constitutionally entitled.[104] It beggars common sense and experience to believe that public confidence in our legal system relies precariously upon prosecutors who will refuse to admit that a demonstrable legal error has occurred and who will fight to ensure that those defendants who deserve relief will be denied it. Philadelphia's voters have chosen to elect Lawrence Krasner as District Attorney three times. This reality may not please Justices on this Court, but it does undermine any claim that our intervention is necessary in order to maintain or restore the people's confidence.

---

[104] Justice McCaffery misconstrues this point. This has nothing to do with the integrity, honor, or impartiality of the OAG. Nor do I question or doubt that OAG agents and attorneys act accordingly on a daily basis. Conc. Op. (McCaffery, J.) at 18 n.16. The point is that, unlike Justice McCaffery, I do not assume that every concession by a prosecutor is improper or that each concession diminishes the public's faith in our criminal justice system. To the contrary, the public desires the type of prosecutor that evaluates every case individually, on its own merits, and without reflex or rote opposition. A prosecutor must be free to approach each case with an open mind and to make those choices necessary to achieve justice. The public's faith is tethered to a prosecutor free to pursue whatever course legally is available to ensure such a result. This Court's insistence that a prosecutor exercise discretion in only one way does nothing to increase the public's confidence in the reliability or fairness of our criminal justice system.

Justice McCaffery would hold that the PCRA court abdicated its duty in this case, not because the court committed any legal error, but because the court apparently was playing the wrong role. In this reimagining of the PCRA, the court's role is far more expansive than application of the relevant law to the facts of the case. Justice McCaffery would have the PCRA court shed its traditional role of neutral referee. The PCRA court would transform from an impartial arbiter into an interested party, one that represents, and serves as the "guardian" of, the "community's interest."[105] Neither the PCRA statute, nor any other law, envisions a court's role thus. A court is not a party, and it never has been. A court does not, and cannot, represent a person or an interest. A court must always be a "neutral referee,"[106] lest the judicial system no longer lay claim to impartiality and disinterest. The community's interest in a case is represented by the District Attorney that the voters of that community have elected. A court may not expand its constitutional lane in order to assume a responsibility that a District Attorney failed, or chose not, to shoulder. A court has one role: apply the applicable law to the facts of the case fairly, accurately, and without bias. A court has no stake in the outcome of a case. It represents no interest, whether that interest is labeled "the community's interest" or something else. There is no hole in Lady Justice's blindfold. The public has an option when an elected official fails to serve as the "guardian of the community's interest." It can replace that official via the ballot box. A PCRA court has no authority to serve as that guardian in the meantime.

Notwithstanding his claim that the "PCRA court itself is no longer purely a neutral referee, but a guardian of the community's interest in an existing conviction by ensuring the Act's requirements are met before relief is granted," Justice McCaffery disclaims any

---

[105]    Conc. Op. (McCaffery, J.) at 9.

[106]    *Id.*

wish that the court abandon its neutrality.[107] Yet, even he concedes that his new conception of the PCRA court's role "obviously creates tension with the traditional role of judges in our adversarial system."[108] Justice McCaffery cannot have it both ways. A court cannot abandon its traditional role as an unbiased arbiter—one with no interest in the outcome or the parties—and still be viewed by the public as neutral and impartial. Justice McCaffery suggests that it is necessary for a PCRA court to take on the "guardian of the community's interest" role in order to ensure that "duly enacted legislation" is "being followed, regardless of the desires of the nominal parties."[109] Following the law is not unique to the PCRA. All courts, whether civil or criminal, are obligated to ensure that the law is followed. It is critical to our system of justice that every court performs that function fairly and impartially, regardless of outcome. Both the functioning, and the faith, in our legal system deteriorate when any court forsakes its impartiality and abandons its role as a "neutral referee." This Court should not encourage such divergence.

Justice McCaffery justifies his reimagination of the PCRA court's role by invoking his own personal view that there is "a crisis of confidence."[110] On one side, he tells us, there is "a portion of the public" (which, he tells us, "District Attorney Krasner represents") that supports the DAO. On "the other side," Justice McCaffery tells us, are families of murder victims who do not support the DAO. Such political punditry is uncommon in judicial opinions. And rightly so. To the extent that "crises of confidence" or other political problems exist, they must be addressed by the voters, not by courts. Divisions in public opinion are why we have elections. The Philadelphia electorate has spoken. And it will

---

[107] *Id.* at 10 n.8.

[108] *Id.* at 10.

[109] *Id.* at 10 n.8.

[110] *Id.*

speak again.  Its choices are not our affair.  This Court cannot, and should not, choose sides in political debates.  Whether or not Justices like voters' choices is, and must always be, irrelevant.

Like the Majority, Justice McCaffery would use King's Bench jurisdiction to give Family Members a free pass to leapfrog their failure to pursue the legal avenues available to them.  Justice McCaffery argues that King's Bench jurisdiction is "an appropriate (if not necessary) option where questions of jurisdiction are implicated in a trial court's grant of relief and appellate review is foreclosed by circumstances."[111]  That is not what happened here.  The DAO chose—a decision that, as is true for any District Attorney, falls within the bounds of prosecutorial discretion—not to contest the merits of Brown's PCRA petition.  Appellate review was not "foreclosed;" the DAO chose not to pursue that course of action.  Nor were Family Members "foreclosed" from appealing the order denying intervention.  Like the DAO, Family Members chose a course of action during litigation.  It is not this Court's job to save them from the effects of their informed decisions.  And this Court has no duty to reforge voluntary litigation choices into "foreclosures" in order to do so.

Justice McCaffery innovates a different interpretation of the CAA as well.  According to Justice McCaffery, for decades now, countless state courts (including this one), federal courts, PCRA petitioners, and prosecutors have all been wrong in believing that District Attorneys (and their assistants) can represent the Commonwealth in PCRA litigation.  This uniformity of practice notwithstanding, Justice McCaffery views the last several decades as a benighted period of profound and universal error.  Even though, as far as I can tell, the OAG has never before claimed it, Justice McCaffery now would assign the OAG an exclusive role:  he construes the CAA as mandating that the only party

---

[111]    *Id.* at 4.

authorized by law to represent the Commonwealth in PCRA cases is the OAG.[112] If this is true, then every argument, filing, and appeal offered by a District Attorney (or his or her assistants) since the enactment of the PCRA in 1995 has been a legal nullity.

That the PCRA is "civil in nature"[113] does not mean that a PCRA petition is a "civil action" as contemplated by the CAA.[114] The CAA obligates the OAG to represent the Commonwealth only in those civil actions that are "brought by or against the Commonwealth."[115] A PCRA petition is not "brought by" the Commonwealth. A PCRA petition can be filed only by a person convicted of a crime and serving a sentence.[116] The OAG would be statutorily obligated to represent the Commonwealth in every PCRA case only if a PCRA petition is an action filed "against the Commonwealth."[117] The PCRA is

---

[112] Justice McCaffery claims that my disagreement with his proposed remedy reveals me as "oblivious" to the "spirit and letter of the PCRA statute." *Id.* at 18 n.17. He protests too much. By its own terms, the "spirit" of the PCRA is to "provide[] for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa.C.S. § 9542. The General Assembly did not enact the PCRA with the goal of replacing District Attorneys who have an interest in the outcome of their county proceedings with the statewide OAG. Justice McCaffery cites no cases from this (or any) Court even hinting that the "spirit" of the PCRA necessitates his proffered remedy. Even less compelling is Justice McCaffery's claim that the remedy accords with the "letter" of the PCRA. Needless to say, the "letter" of the PCRA mandates no such remedy, and Justice McCaffery points to none.

[113] *See supra* n.88.

[114] *See* 71 P.S. § 732-205(c).

[115] *Id.*

[116] 42 Pa.C.S. §§ 9542 ("This subchapter provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief."); 9543(a)(1) ("To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence . . . [t]hat the petitioner has been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted . . . currently serving a sentence of imprisonment, probation or parole for the crime[.]").

[117] 71 P.S. § 732-205(c).

not such an action, and it never has been held to be one. A PCRA petition is not a lawsuit. It is a collateral attack on the judgment of sentence. The Commonwealth is not the object of the action. It is not being sued, and it is not suing anyone. The Commonwealth is a named party only because it prosecuted the charges that led to the judgment of sentence. The PCRA petitioner seeks "collateral relief"[118] in the form of a new trial or sentence. The PCRA petition does not seek an injunction (or other equitable relief) against the Commonwealth, nor does it seek to hold the Commonwealth financially liable for its actions, as is the case in ordinary civil matters. Indeed, the PCRA action is governed by the Rules of Criminal Procedure, not the Rules of Civil Procedure. PCRA litigation is civil in nature because the litigation does not end with a conviction and judgment of sentence. In other respects, it is *sui generis* in our law. Under no reasonable interpretation can a PCRA claim be considered an action "brought . . . against the Commonwealth."

Justice McCaffery ignores the language of the CAA in its entirety. So long as the Commonwealth is named in the caption of a case, he discerns a case "brought by or against the Commonwealth."[119] The Commonwealth prosecuted and imprisoned the PCRA petitioner,[120] but a PCRA petition does not seek to hold the government liable for that conviction and sentence. It is a legal mechanism that seeks collateral relief. The PCRA petitioner requests a new trial or sentence or a full discharge. Most of the claims authorized by the PCRA have nothing to do with the Commonwealth. For instance, a PCRA petitioner can allege that his guilty plea was unlawfully induced, that new evidence demonstrating his or her innocence has been discovered, that the sentence was illegal,

---

[118]    42 Pa.C.S. § 9542.

[119]    Conc.Op. (McCaffery, J.) at 13 n.13.

[120]    *Id.*

or that the trial court lacked jurisdiction.[121]  Perhaps the most common PCRA claim is a challenge to counsel's effectiveness.  In no reasonable understanding of the PCRA can a claim against defense counsel be construed as a claim "brought by or against the Commonwealth."  Justice McCaffery ignores these particulars and assumes that, because the PCRA is "civil in nature," and because the word "Commonwealth" appears in the caption of the case, the CAA must apply.  Even the most rudimentary interpretation of the PCRA demonstrates that it is not the type of action contemplated by the CAA.  This conclusion is not, as Justice McCaffery claims, "unprincipled resistance to questioning," nor is it bereft of legal analysis.  It is instead a straightforward understanding of the terms and purposes of the PCRA, as they have been understood by every court since the PCRA was enacted.

The consequences of Justice McCaffery's novel reading of the CAA would be severe.  For one thing, that reading would open the door to a never-ending stream of litigation, inasmuch as, under that view of the CAA, thousands of PCRA petitions have been litigated by parties without standing or legal authority to act.  For another, the OAG would suddenly become responsible for the thousands of PCRA petitions filed each year in each of Pennsylvania's sixty-seven counties.  If Justice McCaffery's interpretation of the CAA were to prevail, imagine the OAG's surprise when it learns that it must shoulder this immense burden and immediately assume the obligation of litigating every PCRA petition filed in every Pennsylvania county, and with nothing more than the personnel and resources that it currently possesses.[122]  Fortunately, the CAA requires no such thing.

---

[121]    42 Pa.C.S. § 9543(a)(2).

[122]    Justice McCaffery waves away this considerable burden to the OAG by speculating that the burden will be offset by the decrease in burden for District Attorney offices.  Conc. Op. (McCaffery, J.) at 13-14 n.14.  This will be no solace to the OAG. Justice McCaffery seems to believe that the OAG and District Attorney offices pool resources.  They do not.  Although District Attorneys undoubtedly would welcome the (continued…)

Justice McCaffery finds it "bewildering" that "courts should sit silently as injustices unfold under their very noses." The unfortunate reality is that, not only is this a common occurrence, but it also is mandated in many ways by the law. Jurisdictional bars, such as the PCRA's one-year time limit, and our strict waiver doctrine, frequently require courts to slam the door in the faces of litigants, even those to whom the law would otherwise provide relief. We demand that courts erect those barriers regardless of circumstance, merits, or resulting injustice. The law applies equally to one and all. That unhappy results may ensue provides no license for us to rewrite or circumvent the law.

## Conclusion

The Majority is correct that, as an officer of the court and minister of justice, a prosecutor is "duty-bound to confess error, provided that the facts and law call for it."[123] There is a system in place for determination of instances in which the facts and law did not call for the prosecutor's concession. As Justice Brobson explains, when a concession is made in a case where it is not clear that a defendant is entitled to relief, "a PCRA court should consider the prosecutor's concession of error, any stipulated facts from the parties, and the position of any intervenors or *amici*, all as a means to aid the court in its disposition of the PCRA petition."[124] That is exactly what the PCRA court did in this case. There is no need to invoke our King's Bench jurisdiction in order to create a new procedure to achieve what already has been done. There is ample evidence proving that courts are managing prosecutorial concessions successfully, and to a degree that renders our intervention unnecessary and gratuitous. Pennsylvania courts and Federal courts

---

reduced workload, that does nothing to add to the personnel and resources necessary for the OAG to take on every PCRA case in Pennsylvania.

[123]    Maj. Op. at 2.

[124]    Conc. Op. (Brobson, J.) at 4.

alike have proven adept at sifting through the DAO's confessions of error, rejecting those that are unwarranted, and giving due weight to those that are. We should continue to trust those courts, subject to ordinary appellate review.

The Majority refuses to do so. The Majority forces PCRA courts in Philadelphia to notify the OAG when the DAO concedes that relief is due, and to invite the OAG's participation. This is not merely a supervisory procedural mechanism. It is a substantive mandate.[125] The Court's engrafting of this mandate upon the CAA is a glaring violation of our constitutional duty to maintain the separation of powers.

The Majority's actions stem from its palpable distaste for the discretionary decisions that the current prosecutors—under the direction of District Attorney Krasner—in the DAO routinely make. The Majority fervently believes that the DAO concedes relief too often. It is not this Court's job to manage the manner in which an elected prosecutor exercises his or her discretion. District Attorney Krasner has been abundantly clear in how he has exercised, and will continue to exercise, that discretion. Like it or not, the Philadelphia electorate has expressed its will in the voting booth, and it has elected District Attorney Krasner three times. It appears that Philadelphia voters approve and endorse the manner in which District Attorney Krasner executes the duties of his office.

---

[125] The Majority insists that its remedy is but a "constitutional procedural rule," and not a substantive mandate. Maj. Op. at 99 n.72. As support, the Majority cites several procedural rules that allow the OAG to intervene as a party. *Id.* (citing Pa.R.A.P. 3775(c)(2); Pa.R.C.P. 235; and Pa.R.A.P. 521(b)). None of the rules cited by the Majority was promulgated and imposed by fiat in an opinion of this Court. Instead, each rule went through our established rulemaking process, a deliberative and painstaking enterprise in which this Court, assisted by expert practitioners, and informed by public notice and comment, ensures that a rule is necessary and proper and that the subject matter falls within this Court's constitutional authority. King's Bench jurisdiction is not a license to excise from this process valuable and thoughtful input from those who have more ongoing experience in the current, daily practice of law than the Justices of this Court. That expertise is essential to our ability to create and publish fair and workable rules.

It is of no moment whether Justices of this Court agree with them.[126] It is not our job to provide a second opinion simply because this Court believes the job should be done in a different or more traditional way, or by someone more to this Court's liking.

When the electorate is unsatisfied with the performance of an elected official, the remedy lies in the ballot box. It does not lie in this Court. This Court should have rejected Family Members' attempt to circumvent our settled processes. Because this Court should not have exercised King's Bench jurisdiction in this case, I respectfully dissent.

---

[126] This Court should not unilaterally circumvent any District Attorney's policy judgments or discretionary decisions. Unlike Justice McCaffery, I believe DA Krasner's "**performance**" (see Conc. Op. (McCaffery, J.) at 18 n.17 (emphasis in original)), like the "performance" of any elected District Attorney, is assessed by the citizens of his county rather than by the Justices of this Court. It is not this Court's responsibility or role to override the voters' will by providing a different perspective on every PCRA case in which DA Krasner exercises his discretion in a manner contrary to what Justices of this Court might expect or prefer from a prosecutor. Rather than responding to my view that this Court should exercise King's Bench jurisdiction with restraint, and that any perceived problems should be resolved through legislative amendment or our well-established rule-making process, Justice McCaffery chooses instead to erect a strawman: he asserts that I would exempt DAs "from conflict of interest rules because they won an election" *Id.* This is a flawed assertion that conflates unrelated principles. Nothing about my disagreement with this Court's overzealous invocation of King's Bench jurisdiction here suggests that DA Krasner, or any other prosecutor or lawyer, cannot be held responsible for violations of our Rules of Professional Conduct. There are well-established procedures by which we address such violations. Those procedures should be followed in every case in which potential ethical breaches exist. There is no Krasner exception. No rule or principle allows this Court to treat one prosecutor's office differently and adjudicate claims regarding that office without a record or hearing.